# NORTHERN INDIANA PUBLIC SERVICE CO. *v.* PORTER COUNTY CHAPTER OF THE IZAAK WALTON LEAGUE OF AMERICA, INC., ET AL.

No. 75–4.  Decided November 11, 1975

PER CURIAM.

An Atomic Energy Commission Atomic Safety and Licensing Board approved the issuance of a construction permit to Northern Indiana Public Service Co. (NIPSCO) for a commercial nuclear powered electrical generating plant proposed to be built on the south shore of Lake Michigan, in Porter County, Ind., RAI–74–4, p. 557 (1974).  On appeal, an AEC Atomic Safety and Licensing Appeal Board, RAI–74–8, p. 244 (1974), sustained the approval.  On petition for review by intervenors in the administrative proceedings,[1] a divided panel

---

[1] Porter County Chapter of the Izaak Walton League of America, Inc.; Concerned Citizens Against Bailly Nuclear Site; Businessmen

of the Court of Appeals for the Seventh Circuit set aside the approval on the ground that the Licensing Board and the Appeal Board failed to follow the Commission's own regulations governing "population center distance" in the nuclear plant siting. 515 F. 2d 513 (1975). The petition for certiorari is granted, and the judgment of the Court of Appeals is reversed.

Title 10 CFR § 100.10 (b) (1975) of the Commission's regulations provides that "the Commission will take . . . into consideration in determining the acceptability of a [proposed nuclear plant] site" the "population center distance," defined in 10 CFR § 100.3 (c) (1975) as "the distance from the reactor to the nearest boundary of a densely populated center containing more than about 25,000 residents." At the time of NIPSCO's application and also at the time of the Court of Appeals' decision, 10 CFR § 100.11 (a)(3) (1975) further provided, in pertinent part, that "[a]s an aid in evaluating a proposed site" for a nuclear power plant a permit applicant should determine for the proposed unit a

> "population center distance of at least one and one-third times the distance from the reactor to the outer boundary of the low population zone. In applying this guide, due consideration should be given to the population distribution within the population center."

Two miles was the minimum allowable "population center distance" determined administratively pursuant to § 100.11 (a)(3). Accepting this determination, the Court of Appeals held that issuance of the construction permit violated the agency's own regulations be-

for the Public Interest, Inc.; James E. Newman; Mildred Warner; and George Hanks.

NIPSCO, the State of Illinois, and the city of Gary, Ind., intervened before the Court of Appeals.

cause the corporate boundary of the city of Portage, Ind.—projected to have a population in excess of 25,000 by 1980—lay within 1.1 miles of NIPSCO's proposed site. In reaching this conclusion the Court of Appeals rejected the agency's administrative interpretation of its regulations as prescribing computation of "population center distance" for § 100.11 (a)(3) purposes, where the difference is critical to the siting decision, not solely to a political boundary but to the boundary of "that portion of the population center at which the dense population starts," RAI–74–4, at 565. Under that interpretation of the regulations the "population center distance" was an acceptable 4.5 miles.[2]

The Court of Appeals erred in rejecting the agency's interpretation of its own regulations. That interpretation is supported by the wording of the regulations and is consistent with prior agency decisions.[3] The wording does not equate a "dense population center" with a city or other political entity, nor does it define a "boundary" in terms of pre-existing lines drawn for nonsiting purposes. Rather, the regulations require consideration of "population distribution within the population center" in applying the "population center distance" guide. Political boundaries, in contrast, may be drawn for many

---

[2] We do not understand the Court of Appeals' discussion of the evidence regarding population distribution within Portage to imply an alternative ground for the holding that the agency violated its own regulations.

[3] *In re Consumers Power Co.*, 5 A. E. C. 214, 218 (1972) (although political boundary of nearby city was within low-population zone, "the reduced population distance was acceptable" since "populous areas" of the city were farther removed from the reactor site than one and one-third times the low-population zone radius); *In re Consolidated Edison Co.*, 5 A. E. C. 43, 45 (1972); cf. *In re Southern California Edison Co.* (San Onofre Station), RAI–74–12, pp. 957, 960 n. 7 (1974).

reasons irrelevant to safe reactor siting, and thus encompass areas never likely to harbor a significant population.[4] But even if the meaning is not free from doubt, the agency's reliance upon the actual boundaries of population density in its interpretation sensibly conforms to the purpose and wording of the regulations. In that circumstance, the Court of Appeals was "obligated to regard as controlling [such] a reasonable, consistently applied administrative interpretation . . . ." *Ehlert* v. *United States*, 402 U. S. 99, 105 (1971). See also *Udall* v. *Tallman*, 380 U. S. 1, 16–17 (1965); *Power Reactor Co.* v. *Electricians*, 367 U. S. 396, 408 (1961); *Bowles* v. *Seminole Rock & Sand Co.*, 325 U. S. 410, 413–414 (1945).[5]

The judgment is reversed, and the case is remanded for consideration of other contentions against the issuance of the construction permit not decided by the Court of Appeals.

*So ordered.*

MR. JUSTICE DOUGLAS, concurring.

The Atomic Energy Commission, by general regulations, limited the location of nuclear power plants so as not to be nearer than a specified number of miles from population centers. After issuing a construction

---

[4] The Court of Appeals' opinion also notes that the boundaries of 1970 census enumeration districts, including an area within Portage's political limits, lay less than a mile from the proposed reactor site. The location of these boundaries, however, without more, has no greater significance than the location of the corporate border.

[5] Our decision does not rely upon a revision of 10 CFR § 100.11 (a)(3), 40 Fed. Reg. 26526 (1975), published after the decision of the Court of Appeals by the Nuclear Regulatory Commission, which, pursuant to the Energy Reorganization Act of 1974, § 201, 88 Stat. 1242, 42 U. S. C. § 5841 (1970 ed., Supp. IV), now discharges the licensing responsibility formerly exercised by the Atomic Energy Commission.

permit which the Court of Appeals held violated those regulations, that agency's successor, the Nuclear Regulatory Commission, amended the regulations so as to permit the deviation. 40 Fed. Reg. 26526 (1975). By its decision today, the Court holds that the Court of Appeals "erred in rejecting the agency's interpretation of its own regulations." *Ante,* at 14. I read today's decision as in no way relying on the agency's *post hoc* amendment of its regulations to save in this Court its issuance of the construction permit. *Ante,* at 15 n. 5. I therefore concur in the Court's decision. The Nuclear Regulatory Commission's conduct in the course of this litigation, however, compels further comment.

A certain danger lurks in the ability of an agency to perfunctorily mold its regulations to conform to its instant needs. In the present case, regulations performed an important function of advising all interested parties of the factors that had to be satisfied before a license could be issued. If those conditions can be changed willy-nilly by the Commission after the hearing has been held and after adjudication has been made, the Commission is cut loose from its moorings, and no opponent of the licensing will be able to tender competent evidence bearing on the critical issues. Not just the Commission, but the entire federal bureaucracy is vested with a discretionary power, against the abuse of which the public needs protection. "[A]dministrators must strive to do as much as they reasonably can do to develop and to make known the needed confinements of discretionary power through standards, principles, and rules." K. Davis, Discretionary Justice 59 (1969). Confinement of discretionary power, however, cannot be obtained where rules can be changed and applied retroactively to affect a controversy.

For some years, the agency which was supposed to

promote nuclear energy was also charged with the responsibility of protecting the public against its abuse. But a promoter is naturally shortsighted when it comes to the adverse effects of his project on the community. With the establishment of the Nuclear Regulatory Commission, Congress undertook to rectify this weakness in the control system by separating the promotion function from the function of safeguarding the public.[1] But the power to change the rules after the contest has been concluded would once more put the promotion of nuclear energy ahead of the public's safety.

Eminent scientists have been steadfast in opposing the growth of nuclear power plants in this Nation. The number who think nuclear power should be abandoned has been growing.[2] The future of nuclear power in this

---

[1] The separation of promotional and regulatory functions was accomplished under the Energy Reorganization Act of 1974, 88 Stat. 1233, 42 U. S. C. § 5801 *et seq.* (1970 ed., Supp. IV). The legislation transferred the research and development functions of the AEC to the new Energy Research and Development Administration. § 5814 (c). The AEC's regulatory functions became the responsibility of the Nuclear Regulatory Commission. § 5841 (f). Also transferred to this new Commission were the responsibilities of the Atomic Safety and Licensing Board and the Atomic Safety and Licensing Appeal Board. § 5841 (g).

The legislative history of the Act indicates that this division of functions was "a response to growing criticism that there is a basic conflict between the AEC's regulation of the nuclear power industry and its development and promotion of new technology for the industry." S. Rep. No. 93–980, p. 2 (1974). "The [Nuclear Regulatory Commission] will have solely regulatory responsibilities, in keeping with a basic purpose of this act to separate the regulatory functions of the Atomic Energy Commission from its developmental and promotional functions, which are transferred to [the Energy Research and Development Administration]." *Id.,* at 19.

[2] J. Gofman & A. Tamplin, Poisoned Power: The Case Against Nuclear Power Plants (1971); see Ford & Kendall, What Price

country is not a policy matter for courts to decide, but those who oppose the promotion of nuclear power should have at least a chance to know what the issues are when a case is set down for hearing and adjudication, and to argue meaningfully about those issues. If the rules can be changed by the Commission at any time—even after the hearing is over—the protection afforded by the opposition of scientific and environmental groups is greatly weakened. *Ad hoc* rulemaking in those areas touching the public safety is to be looked upon with disfavor.

Nuclear Power?, 10 Trial 11 (1974); Tamplin, Reacting to Reactors, 10 Trial 15 (1974); Hearings on AEC Licensing Procedure and Related Legislation before the Subcommittee on Legislation of the Joint Committee on Atomic Energy, 92d Cong., 1st Sess., pt. 1, pp. 294–302 (1971).