582 F.2d 77
 12 ERC 1561, 8 Envtl. L. Rep. 20,557
 PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, Petitioner,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION et al., Respondents,
Society for the Protection of New Hampshire Forests, Intervenor.
 No. 77-1419.
 United States Court of Appeals,
First Circuit.
 Argued Jan. 3, 1978.
Decided June 21, 1978.
 
 Thomas G. Dignan, Jr., Boston, Mass., with whom R. K. Gad III, John A. Ritsher, and Ropes & Gray, Boston, Mass., were on brief, for petitioner.
 Harry H. Voigt, James P. McGranery, Jr., Robert S. Faron, LeBoeuf, Lamb, Leiby & MacRae, Washington, D. C., Peter A. Marquardt, Detroit, Mich., and Charles W. Campbell, Plainfield, Ind., on brief for Edison Electric Institute, The Detroit Edison Co., and Public Service Co. of Indiana, amici curiae.
 Stephen S. Ostrach, Atty., U. S. Nuclear Regulatory Commission, Washington, D. C., with whom Jerome Nelson, Gen. Counsel, Stephen F. Eilperin, Sol., Richard S. Mallory, Atty., U. S. Nuclear Regulatory Commission, and Peter R. Steenland, Jr., Chief, App. Section Land and Natural Resources Div., U. S. Dept. of Justice, Washington, D. C., were on brief, for respondents.
 Robert A. Backus, Manchester, N. H., with whom Harvey N. Winchester, Boston, Mass., and O'Neill, Backus, Spielman & Little, Manchester, N. H., were on brief, for Society for the Protection of New Hampshire Forests, intervenor.
 Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.
 BOWNES, Circuit Judge.
 
 
 1
 Petitioner, Public Service Company of New Hampshire (PSCO), challenges the propriety of the Nuclear Regulatory Commission's[1] (Commission) order to reroute certain transmission lines tying the proposed Seabrook Nuclear Power Station (Seabrook) to the New England 345 KV transmission grid. PSCO maintains that the order, drawn so as to minimize environmental injury, is beyond the scope of the Commission's power. PSCO asserts that the Commission's organic statute, specifically section 271 of the Atomic Energy Act of 1954, 42 U.S.C. § 2018,[2] denies the Commission the authority to designate such routing and that the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 Et seq., cannot confer jurisdiction otherwise denied an administrative agency. PSCO also claims that, in issuing the order, the Commission impermissibly preempted state authority.
 
 
 2
 The question we address, Viz., whether the Commission properly can assert jurisdiction over the routing of transmission lines running forth from the nuclear reactor, is one of first impression. At issue is the location of approximately two of the 86 miles of transmission lines that will emanate from Seabrook. The cost of the rerouting represents a miniscule fraction of the total facility costs. The underlying question of the Commission's authority is, nonetheless, an important one.
 
 
 3
 We start with a statement of the background, then discuss NEPA, follow with an analysis of the Commission's jurisdiction, and finally comment on the question of preemption.
 
 Background
 
 4
 PSCO requested certification of its selected site and facility from the New Hampshire Public Utilities Commission, as required by state law. NH RSA § 162-F (Supp.1975). After lengthy hearings which started on June 19, 1972, and included over 5,800 pages of testimony, the certificate was granted by the Public Utilities Commission on January 29, 1974.[3] The certificate included the siting of three transmission lines along the routes proposed by PSCO. In its authorization the Public Utilities Commission added that the approved routes could be later modified upon request, "should meaningful negotiation with responsible local authorities, regional commissions, etc. result in any beneficial route relocations."
 
 
 5
 PSCO then submitted its plans for the nuclear facility and transmission lines to the Atomic Safety and Licensing Board.[4] The routing for the lines generally followed the routes previously submitted to and Conditionally approved (See discussion on preemption, Infra, at 86) by the New Hampshire Public Utilities Commission. After extensive hearings, the Licensing Board approved PSCO's application with two exceptions. The Board conditioned the Seabrook permits on the rerouting of one of the lines around the Pow Wow River-Cedar Swamp rather than PSCO's proposed route directly through it. The Board reasoned that the Pow Wow River-Cedar Swamp was an area containing "relatively dense or pure stands of the Atlantic White Cedar, a species found only in the Atlantic coastal regions . . . which is becoming increasingly scarce as its available habitat is reduced by economic development." The Board also found the marshlands to be an important habitat and flight lane for migratory waterfowl; because of the Pow Wow River, the area is surrounded by an extensive marshland complex, making it one of the few extensive river-marsh ecosystems in southeastern New Hampshire. The Swamp environs are recognized as a natural area by the New England Natural Areas Inventory. Intervenor in this action, the Society for the Protection of New Hampshire Forests, has approximately 10-15% Of the area under its protective ownership, and uses the area, as do campers, canoeists and youth groups, for nature outings. The Board found that PSCO's proposed transmission corridor through the mid-point of the marsh, using two 200-foot high steel lattice-work towers, would result in a diversion of a significant number of migratory waterfowl from the Swamp and would constitute a "visual insult" to the relatively pristine area. The Board proposed a dogleg which would skirt the edge of the natural area and would use 75-foot wooden H-frames, compatible with the surrounding forest.
 
 
 6
 The Licensing Board also directed that the second line under dispute be routed directly through the Packer Bog, rather than the previously approved route which would skirt the edge of the Bog, but would require the cutting of white cedar. PSCO itself indicated that it preferred the route directly through the Bog, but complains before this court that the Board could not have "ordered" it to adopt this route.[5]
 
 NRC's Responsibility Under NEPA
 
 7
 The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321 Et seq., articulated a mandate to federal agencies to "use all practicable means" to avoid environmental "degradation," and to preserve "natural aspects of our national heritage" to the extent consistent with "other essential considerations of national policy . . .." 42 U.S.C. § 4331(b). See also Federal-Aid Highway Act of 1962, 23 U.S.C. § 138; Department of Transportation Act of 1966, 49 U.S.C. § 1653(f). Congress directed federal agencies to consider "to the fullest extent possible" the environmental impact of their policies, regulations, and actions. 42 U.S.C. § 4332. This charge is "neither accidental nor hyperbolic." Flint Ridge Dev. Co. v. Scenic Rivers Assn., 426 U.S. 776, 787, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976). NEPA is activated whenever a major federal action may significantly affect the human environment. 42 U.S.C. § 4332(2)(C). Licensing of a nuclear power station by a federal regulatory commission is a major federal action. NRDC v. NRC, 547 F.2d 633, 638 (D.C.Cir.1976), Rev'd on other grounds sub nom. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). See also 40 C.F.R. § 1500.5(a)(2); Murphy, The National Environmental Policy Act and the Licensing Process: Environmentalist Magna Carta or Agency Coup de Grace?, 72 Colum.L.Rev. 963, 966-967 (1972).
 
 
 8
 NEPA's mandate has been given strict enforcement in the courts, with frequent admonitions that it is insufficient to give mere lip service to the statute and then proceed in blissful disregard of its requirements. See, e. g., Flint Ridge Dev. Co., supra, 426 U.S. at 787-788, 96 S.Ct. 2430; County of Suffolk v. Secretary of Interior, 562 F.2d 1368, 1389 (2d Cir. 1977), Cert. denied, 435 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); Silva v. Lynn, 482 F.2d 1282, 1287 (1st Cir. 1973); Calvert Cliffs' Coord. Com. v. AEC, 146 U.S.App.D.C. 33, 41, 449 F.2d 1109, 1117 (1971). Section 102(2)(C), 42 U.S.C. § 4332(2)(C), is an "action forcing" provision, Kleppe v. Sierra Club, 427 U.S. 390, 409, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976); Greene County Planning Board v. FPC, 455 F.2d 412, 415 (2d Cir.), Cert. denied, 409 U.S. 849, 93 S.Ct. 56, 34 L.Ed.2d 90 (1972), which imposes a duty upon federal agencies to act so as to effectuate the purposes of the statute to the fullest possible degree. See 115 Cong.Rec. (Part 30) 40416, 40419 (1969). The directive to agencies to minimize all unnecessary adverse environmental impact obtains except when specifically excluded by statute or when existing law makes compliance with NEPA impossible. Flint Ridge, supra, 426 U.S. at 787-788, 96 S.Ct. 2430; Calvert Cliffs, supra, 146 U.S.App.D.C. at 37, 449 F.2d at 1115 and n. 12; 40 C.F.R. § 1500.4(a); 115 Cong.Rec. 39703 (1969).[6] As stated by the court in Calvert Cliffs, "Unless (specific statutory) obligations are plainly mutually exclusive with the requirements of NEPA, the specific mandate of NEPA must remain in force." 146 U.S.App.D.C. at 49, 449 F.2d at 1125. Unless there are specific statutory provisions which necessarily collide with NEPA, the Commission was under a duty to consider and, to the extent within its authority,[7] minimize environmental damage resulting from Seabrook and its transmission lines.
 
 
 9
 Does The NRC's Organic Statute Bar The Commission From Exercising Any Authority Over Transmission Lines?
 
 
 10
 We examine the Commission's organic statute, 42 U.S.C. §§ 2011 Et seq. and 42 U.S.C. §§ 5801, 5841-5849, to determine whether there is an inevitable clash between it and the exercise by the Commission in this instance of its NEPA-mandated duty. Both the Atomic Energy Act of 1954 and the Energy Reorganization Act of 1974 confer broad regulatory functions on the Commission and specifically authorize it to promulgate rules and regulations it deems necessary to fulfill its responsibilities under the Acts,42 U.S.C. § 2201(p). In a regulatory scheme where substantial discretion is lodged with the administrative agency charged with its effectuation, it is to be expected that the agency will fill in the interstices left vacant by Congress. See Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954); Henry v. FPC, 168 U.S.App.D.C. 137, 144, 513 F.2d 395, 402 (1975). The Atomic Energy Act of 1954 is hallmarked by the amount of discretion granted the Commission in working to achieve the statute's ends. The Act's regulatory scheme "is virtually unique in the degree to which broad responsibility is reposed in the administering agency, free of close prescription in its charter as to how it shall proceed in achieving the statutory objective." Siegel v. AEC, 130 U.S.App.D.C. 307, 312, 400 F.2d 778, 783 (1968). The agency's interpretation of what is properly within its jurisdictional scope is entitled to great deference, Power Reactor Co. v. Electricians, 367 U.S. 396, 408, 81 S.Ct. 1529, 6 L.Ed.2d 924 (1961); Nader v. NRC, 168 U.S.App.D.C. 255, 265-66, 513 F.2d 1045, 1055-56 (1975), and will not be overturned if reasonably related to the language and purposes of the statute. Hardin v. Kentucky Utilities Co., 390 U.S. 1, 8, 88 S.Ct. 651, 19 L.Ed.2d 787 (1968); NLRB v. Hearst Publications, 322 U.S. 111, 131, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); Bangor and Aroostock Ry. Co. v. ICC, 574 F.2d 1096, 1104 n. 8 (1st Cir. 1978).
 
 A. The Commission's Interpretation
 
 11
 The crucial issue here is the Commission's interpretation of the term "utilization facility."[8] The Commission has been granted explicit authority by Congress to expand upon the statutory definition: "The term 'utilization facility' means . . . (2) any important component part especially designed for such equipment or device as determined by the Commission." 42 U.S.C. § 2014(cc). Pursuant to its rule making authority, the Commission issued the following definition:
 
 
 12
 "Utilization facility" means any nuclear reactor other than one designed or used primarily for the formation of plutonium or U-233.
 
 
 13
 Note: Pursuant to subsection 11v. and 11cc. (42 U.S.C. § 2014(v), (cc)), respectively of the Act, the Commission may from time to time add to, or otherwise alter, the foregoing definitions of production and utilization facility. It may also include as a facility an important component part especially designed for a facility . . . .
 
 
 14
 10 C.F.R. § 50.2(b).
 
 
 15
 At least since 1968, the Commission has included in its working definition of "utilization facility" both the nuclear reactor and "equipment associated with a nuclear reactor" since "associated equipment may be integral to the operation of a reactor and . . . such equipment can have nuclear safety significance." Philadelphia Electric Company (Peach Bottom Atomic Power Station Units 2 and 3), 4 AEC 109, 111-112 (1968). In Detroit Edison Company (Greenwood Energy Center, Units 2 and 3), ALAB-247; 8 AEC 936 (1974), the Commission construed utilization facility to include transmission lines running forth from the nuclear plant, affirming the broad interpretation given in Peach Bottom. This posture by the Commission has been steadily maintained ever since. See, e. g., Virginia Electric & Power Co. (North Anna Nuclear Power Station, Units 1 and 2), ALAB-325, NRCI-76/4 404 (April 16, 1976), Petition for review dismissed sub nom. Culpeper League for Environmental Protection v. NRC, 574 F.2d 632, Nos. 76-1484 and 76-1532 (D.C.Cir.1978); Kansas Gas and Electric Company (Wolf Creek Nuclear Generating Station, Unit No. 1), 5 NRC 1 (1977).
 
 
 16
 In light of the Commission's longstanding reliance on this definition, and its seemingly reasonable relation to the language and purposes of the statute, it is incumbent on the petitioner to point out in what manner the interpretation given by the Commission is so contrary to the purposes of the regulations or statute as to warrant intervention and correction by this court. See Northern Ind. Pub. Serv. Co. v. Walton League, 423 U.S. 12, 14-15, 96 S.Ct. 172, 46 L.Ed.2d 156 (1975). This, petitioner has failed to do. PSCO's petition, in essence, is a collateral attack on the Commission's determination that "utilization facility" includes transmission lines. This is a particularly inappropriate forum in which to launch such an attack. There is nothing in the material before us which suggests the propriety of our deciding, in the complete absence of any factual background on the subject, that the Commission erred in asserting that transmission lines are properly construed as coming within the definition of "utilization facility." Cf. Gage v. AEC, 156 U.S.App.D.C. 231, 237-238, 479 F.2d 1214, 1220-1221 (1973). We are mindful of the broad grant of authority given to the Commission in making such determinations, See 42 U.S.C. § 2014(cc)(2), and the deference due this determination. Power Reactor Co., supra, 367 U.S. at 408, 81 S.Ct. 1529; Cf. Vermont Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (April 3, 1978). Naturally, nothing precludes PSCO, or any interested person, from petitioning the Commission to amend or rescind its determination that "utilization facility" includes equipment associated with a reactor, such as transmission lines. See 10 C.F.R. §§ 2.802 and 2.803.
 
 B. The Commission and Congress
 
 17
 As noted, Supra, since 1968, the Commission has claimed the authority to assert jurisdiction over equipment associated with a nuclear reactor and, at least since 1971 (when regulations relating to transmission lines were first proposed), has claimed the specific right to oversee the siting of transmission lines.[9] While ordinarily, silence on the part of Congress regarding activity by an administrative agency should not be liberally read as approval, in the case of the Commission, inaction by Congress has been read as "De facto acquiescence in and ratification of the Commission's licensing procedure by Congress." Power Reactor Co., supra, 367 U.S. at 409, 81 S.Ct. at 1536.[10] See also New Hampshire v. AEC, 406 F.2d 170, 174 (1st Cir.), Cert. denied, 395 U.S. 962, 89 S.Ct. 2100, 23 L.Ed.2d 748 (1969); 42 U.S.C. § 2252. This is due to the unusual oversight by the Joint Committee on Atomic Energy[11] regarding the Commission's activities, a special relationship which, as we noted once before, is "rarely embodied in positive law." 406 F.2d at 174. For ten years, the Commission has given an expanded reading to the term "utilization facility" to include equipment associated with a nuclear reactor.[12] In light of the special statutory relationship between the Commission and the Joint Committee, and in view of the Supreme Court's comments in Power Reactor, we think it fair to posit that had Congress viewed this as an unwarranted expansion of jurisdiction, restrictive action would have been taken. Compare, Note, The Central Intelligence Agency: Present Authority and Proposed Legislative Change, 62 Va.L.Rev. 332, 364-370 (1976).
 
 C. 42 U.S.C. § 2018
 
 18
 We next turn our attention to petitioner's contention that section 271 of the Act, 42 U.S.C. § 2018, is a positive bar to the Commission's exercise of any jurisdiction over transmission lines. The pertinent language in the statute reads:
 
 
 19
 Nothing in this Act shall be construed to affect the authority or regulations of any Federal, State, or local agency with respect to the generation, sale, or transmission of electric power produced through the use of nuclear facilities licensed by the Commission . . . .
 
 
 20
 Petitioner interprets this to mean the Commission is barred from asserting any authority over transmission Lines. We cannot agree. In the first place, even were there a proscription (which there is not) against the Commission's exercise of jurisdiction over transmission of electricity, such proscription would not necessarily run to the exercise of jurisdiction over transmission Lines. In the second place, the language of section 271 is that of maintaining the authority of Other agencies; it is not a backhanded manner of withdrawing jurisdiction of the Commission over subjects properly within its ambit. The section is a statement that the Commission will not preempt existing authority in the areas mentioned. Petitioner's flawed interpretation can perhaps best be exposed by extending its reading to the entire section, and not just to the word "transmission." If we were to adopt petitioner's position that section 271 operates as a positive bar, then it must perforce extend to the entire section, Viz., the Commission is also barred from maintaining jurisdiction over the Generation or sale of electricity. Since commercial nuclear power plants' Raison d'etre is to generate electricity and since they are constructed to perform this function, petitioner's strained reading of section 271 would mean that the Commission is barred from any exercise of jurisdiction over the very plant itself. We think this result demonstrates the fundamental error in PSCO's interpretation.[13]
 
 
 21
 That the interpretation suggested by PSCO is not warranted can be seen as well from a review of the legislative history of section 271. In light of the prior monopolistic control by the federal government over all aspects of nuclear energy, there was concern by certain senators that the new grant of authority to private industry to develop nuclear power for generation of electricity might mean that the traditional regulatory bodies would be displaced. There was particular worry that the Federal Power Commission might be ousted from regulating electricity produced by nuclear energy. Much of the debate on section 271 revolved around this preoccupation. While being assured by the sponsor of the Act, Senator Hickenlooper, that section 271 saved to the Federal Power Commission its regulatory role for electricity produced by nuclear power, Senator Humphrey finally prevailed in urging the Senate to pass section 272, 42 U.S.C. § 2019, which does so in specific language. Nothing in the floor debates suggests that section 271 was other than a garden-variety nonpreemption clause. See 100 Cong.Rec. 12015-12021, 12196-12201 (1954).[14]
 
 
 22
 As we note Infra, this case does not present a situation where federal and state authority are in conflict. The New Hampshire Public Utilities Commission has indicated a willingness to be flexible in the routes PSCO may use for the transmission lines, and the Commission has at this juncture done nothing more than require PSCO to take advantage of this flexibility to minimize adverse environmental impacts. The Commission's order did not preempt the Public Utilities Commission's authority, but rather complemented it. We need not decide, therefore, whether section 271 might apply to a situation where the state agency with authority over siting has an irreconcilable conflict with the Commission, as this case does not present that problem.
 
 
 23
 D. The Commission's Right to Condition Licenses
 
 
 24
 We turn now to a consideration of whether it was error for the Commission to condition its approval of PSCO's license application on the use of the Commission-approved routes.[15] Our preceding analysis compels the finding that there is no "clear and unavoidable," Flint Ridge, supra, 426 U.S. at 788, 96 S.Ct. 2430, statutory conflict which would prohibit the Commission from complying with NEPA's mandate.[16] Once having found that the Commission has jurisdiction over the transmission lines, we think it clear that, under the dictates of NEPA, it was obliged to minimize adverse environmental impact flowing therefrom.[17] We quote Judge Wright from the Calvert Cliffs opinion, "(c)learly, it is pointless to 'consider' environmental costs without also seriously considering action to avoid them." 146 U.S.App.D.C. at 52, 449 F.2d at 1128. The Commission has statutory authority to condition licenses. 42 U.S.C. §§ 2131, 2133(a), 2233. Cf.5 U.S.C. § 551(9); North Anna Env. Coalition v. NRC, 174 U.S.App.D.C. 428, 431, 533 F.2d 655, 658 (1976). In this instance, the Commission used one of its statutory powers in the furtherance of NEPA, whose mandate the Commission must follow. The Commission is under a dual obligation: to pursue the objectives of the Atomic Energy Act And those of the National Environmental Policy Act. "The two statutes and the regulations promulgated under each must be viewed in Para (sic) Materia." Citizens for Safe Power v. NRC, 173 U.S.App.D.C. 317, 325, 524 F.2d 1291, 1299 (1975). We find that the Commission correctly discharged its responsibilities here.
 
 
 25
 Has There Been Preemption?
 
 
 26
 Petitioner finally presses us to find that the order by the Commission has impermissibly preempted state regulatory authority by ordering a route different from that approved by the New Hampshire Public Utilities Commission. We easily dismiss this argument. As the Public Utilities Commission stated in its approval, the routes could later be modified upon request if necessitated by negotiation with other agencies. It held specifically that the authority to construct was conditional upon PSCO's obtaining the "necessary construction and operating permits and/or licenses from the U.S. Atomic Energy Commission." Since one of the routes submitted to the Commission by PSCO differed from that previously approved by the New Hampshire Public Utilities Commission, we find it surprising that PSCO should now argue that the state-approved routes were final and binding and that any change authorized by the Commission is in direct conflict with the State of New Hampshire. Indeed, PSCO stated before the Commission that approval from the state for the different route would be "relatively easy to obtain." Petitioner thus clearly anticipated that the Public Utilities Commission would entertain a request to alter the approved routes. Furthermore, at oral argument the Commission stated that, should PSCO be unable to obtain approval of the new routing from the New Hampshire Public Utilities Commission, it could come back to the Commission. We, therefore, find no ineluctable conflict between New Hampshire and the Commission on this question. It appears that the matter has been purposely left in a fluid state so that head-on collision between the federal and state regulatory bodies could be averted. Moreover, PSCO's contention that there is preemption by the Commission is seriously undermined by the fact that the State of New Hampshire is not a party here to contest the purported arrogation by the Commission of state authority.
 
 
 27
 The Supreme Court, in analyzing statutes to ascertain whether preemption by the federal government has occurred, has looked to such factors as whether the state and federal authority is conflicting; contrary to; repugnant to; irreconcilable with; inconsistent with; in violation of each other. See Perez v. Campbell, 402 U.S. 637, 649, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971); Florida Avocado Growers v. Paul, 373 U.S. 132, 142-143, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941); Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 39, 6 L.Ed. 23 (1824). See also Massachusetts v. United States, 435 U.S. 444, 98 S.Ct. 1153, 55 L.Ed.2d 403 (1978). We cannot find a preemption issue on so skimpy a basis as that presented here. The posture of the case before us suggests no "inevitable collision," Florida Avocado Growers, supra, 373 U.S. at 143, 83 S.Ct. 1210, between the authority exercised by the Commission and that by the New Hampshire Public Utilities Commission.
 
 
 28
 The petition for review is dismissed.
 
 
 
 [1]
 The Energy Reorganization Act of 1974, 42 U.S.C. §§ 5801 Et seq. divided the responsibilities which had previously been held by the Atomic Energy Commission into two bodies. The licensing and related regulatory functions of the AEC were transferred to the Nuclear Regulatory Commission (NRC); the operation of government nuclear research and production facilities was lodged with the Energy Research and Development Administration (ERDA). 42 U.S.C. §§ 5814(c), 5841(f), 5842. We use the word "Commission" to refer both to the AEC and its regulatory successor, the NRC
 
 
 [2]
 The pertinent statutory language is set out, Infra, at page 84
 
 
 [3]
 The actual procedure followed was that hearings were held before the New Hampshire Bulk Power Facility Site Evaluation Committee (NHSEC) and the Public Utilities Commission. NH RSA 162-F:7 (Supp.1975). The NHSEC then made conclusive findings and sent those findings to the Public Utilities Commission, NH RSA 162-F:8(I, II) (Supp.1975), which is charged with the responsibility for issuing the certificate of site and facility, once assured that the construction will not unreasonably adversely affect the natural environment. NH RSA 162-F:8(I) (Supp.1975)
 
 
 [4]
 Applications for licenses are first heard by an Atomic Safety and Licensing Board, 42 U.S.C. § 2241, 10 C.F.R. § 2.721, which may grant or deny issuance of the license. Any aspect of that decision may be appealed by any party to an Atomic Safety and Licensing Appeal Board, 10 C.F.R. § 2.785(a), 10 C.F.R. § 2.762, which enjoys all the powers of review of the Commission. See generally Murphy, Atomic Safety and Licensing Boards: An Experiment in Administration Decision Making on Safety Questions, 33 Law & Contemp.Prob. 566 (1968). Petition for review of the Appeal Board decision may be sought before the Commission itself. 10 C.F.R. § 2.786, as amended, 42 Fed.Reg. 22128, effective June 1, 1977. The Licensing Board issued its initial decision, ordering the change in routes, on June 29, 1976; on July 26, 1977, the Appeal Board affirmed the order; on September 15, 1977, the Commission declined review, thus leaving in effect the order of the Licensing Board as affirmed by the Appeal Board
 
 
 [5]
 Intervenor Society for the Protection of New Hampshire Forests had urged that the Licensing Board either require PSCO to avoid the Pow Wow River-Cedar Swamp area entirely or construct a larger dogleg around the marsh. The Licensing Board rejected Forests' routes because the increased cost for the Swamp dogleg would not be justified by the minimal environmental improvement. Forests argued that on the second line, PSCO should avoid the Packer Bog completely. The Board noted, in rejecting Forests' route, that it might prove less expensive overall, but that it would increase the visual impact in the Town of Greenland, New Hampshire
 
 
 [6]
 NEPA provides the congressional mandate to force "timely and comprehensive consideration of non-radiological pollution effects in the planning of installations ( )", New Hampshire v. AEC, 406 F.2d 170, 176 (1st Cir.), Cert. denied, 395 U.S. 962, 89 S.Ct. 2100, 23 L.Ed.2d 748 (1969), which was previously missing
 
 
 [7]
 The Commission cited Henry v. FPC, 168 U.S.App.D.C. 137, 513 F.2d 395 (1975), for the proposition that NEPA enlarges the proper scope of an agency's jurisdiction. We need not address that question since we find that transmission lines are within the proper scope of the agency's jurisdiction. See discussion, Infra, "A. The Commission's Interpretation."
 
 
 [8]
 It is illegal to build or use any utilization facility except in accordance with a license issued by the Commission. 42 U.S.C. § 2131
 
 
 [9]
 It is pertinent to mention that the exercise by the Commission of jurisdiction over transmission lines has been inferentially assumed correct in other court decisions. See Culpeper League for Environmental Protection v. NRC, 574 F.2d 632, Nos. 76-1485 and 76-1532 (D.C.Cir. March 16, 1978). Cf. Gage v. AEC, 156 U.S.App.D.C. 231, 479 F.2d 1214 (1973)
 
 
 [10]
 The Court in Power Reactor placed importance on the fact that the interpretation being challenged had been brought to the attention of the Joint Committee on several occasions. 367 U.S. at 408, 81 S.Ct. 1529. There is nothing in the record before us to show whether the definition of "utilization facility" as including equipment associated with a nuclear reactor has been questioned before the Joint Committee. However, in light of the strong mandate to exercise supervision over the Commission and the onus placed on the Commission to keep the Joint Committee "fully and currently" informed of all of its activities, 42 U.S.C. § 2252, it is not unreasonable to assume that the Joint Committee has been apprised of the Commission's definition
 
 
 [11]
 On September 20, 1977, the Joint Committee was abolished and all functions previously performed by it were transferred to committees of the Senate and House of Representatives having jurisdiction over the subject matter previously overseen by the Joint Committee. 42 U.S.C. § 2258, Pub.L. 95-110, § 1, 91 Stat. 884
 
 
 [12]
 In addition, the Commission published its regulations dealing specifically with environmental considerations of the transmission lines in the Federal Register, See e. g., 36 Fed.Reg. 22,848 (Dec. 1, 1971) and 37 Fed.Reg. 5745 (Mar. 21, 1972). The regulations appear in 10 C.F.R. § 50.10(e)(1)(iv). The regulations were promulgated to implement NEPA, See Gage v. AEC, 156 U.S.App.D.C. 238, 479 F.2d 1214, 1215 (1973), following the Calvert Cliffs decision that prior Commission regulations inadequately complied with NEPA requirements
 
 
 [13]
 See also 42 U.S.C. § 5847 which directs the Commission to conduct a national survey for future nuclear energy sites. In making the survey, the Commission is instructed specifically to include consideration of transmission line rights-of-way. This suggests again that PSCO's reading of section 271 as a total bar to the exercise of Any jurisdiction over transmission lines is untenable
 
 
 [14]
 Excerpts from the Senate debates underscore the interpretation of section 271, 42 U.S.C. § 2018, as a nonpreemption section
 Mr. HICKENLOOPER. (§ 271) is designed to keep the regulatory authority exactly as it is now, traditionally and under the law.
 Mr. HUMPHREY. What (§ 271) really means . . . is that there is nothing in this act that denies the Federal Power Commission the right to regulate. That is what it means, but it does not say how, and what (I) want( ) to be sure is that the "how" on electrical energy created by atomic matter is the same "how" that is on hydro-generated electricity; that is all.
 Mr. HUMPHREY. What the act provides now is a broad grant, saying that there is nothing in the act that will deny a Federal agency from regulating it. That is not good enough; that is what the Senator from Minnesota calls a negative authorization of potential authority.
 Mr. HICKENLOOPER. What section 271 does is to make clear that this act does not interfere in any way with the jurisdiction of the Federal Power Commission over such activities, or with State agencies where they have jurisdiction, or with local agencies where they have jurisdiction.
 It is not an authority given in a negative way. It is a positive negation of any intent by this statute to interfere with the existing laws and the existing authorities, State and Federal, that have to do with electricity.
 
 
 [100]
 Cong.Rec. 12015, 12016, 12197 (1954)
 
 
 [15]
 Petitioner concedes that there is adequate record support for the finding that the Commission's routes, on a cost/benefit basis, are superior; it maintains nonetheless that the Commission should not have ordered it to adopt said routes
 
 
 [16]
 We, therefore, find no conflict with Kitchen v. FCC, 150 U.S.App.D.C. 292, 464 F.2d 801 (1972), where the court found no NEPA obligations to attach to matters expressly outside the statutory jurisdiction of the administrative agency. The instant case is clearly distinguishable, since we agree with the Commission that it does have the requisite jurisdiction over the lines
 
 
 [17]
 To the extent that PSCO argues that the Commission should have "determined" the environmental impact of the transmission lines and, even finding them unnecessarily harmful to the environment, should have accepted them, it is clearly wrong. While one of the purposes of the environmental impact statement is to serve as an environmental full disclosure law, Silva v. Lynn, 482 F.2d 1282, 1285 (1st Cir. 1973), NEPA requires more. Calvert Cliffs, supra, 146 U.S.App.D.C. at 33, 52, 449 F.2d at 1128