**PEOPLE OF the STATE OF ILLINOIS, Petitioner,**

v.

**NUCLEAR REGULATORY COMMISSION and the United States of America, Respondents,**

**and**

**General Electric Company, Intervenor.**

No. 78–1171.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 3, 1978.

Decided Jan. 10, 1979.

As Amended Feb. 8, 1979.

HARLINGTON WOOD, Jr., Circuit Judge.

On September 16, 1977, the Attorney General of Illinois filed with the Nuclear Regulatory Commission a "Request to Institute a Proceeding and Motion to Modify, Suspend or Revoke Special Nuclear Material License, No. SNM–1265."[1] Approximately three months later the Director of the NRC's Office of Nuclear Material Safety and Safeguards denied the request.[2] Illinois petitioned for review of the final order of the Commission and the two issues presented are (1) whether the Commission has the discretion to deny a request to institute a proceeding and hearing under the Atomic Energy Act of 1954 (Act), and (2) whether the Commission's denial of the request was arbitrary and capricious. We affirm the Commission.

Russell R. Eggert, Asst. Atty. Gen., Chicago, Ill., for petitioner.

Richard S. Mallory, U. S. Nuclear Reg. Comm., Washington, D. C., for respondents.

Before SPRECHER, BAUER and WOOD, Circuit Judges.

I.

■ According to the Act from which the Commission derives its authority, Illinois has no right to a hearing. Section 189(a) of the Act, 42 U.S.C. § 2239(a), provides in part:

In any proceeding under this Act, for the granting, suspending, revoking, or

1. The request contended, *inter alia*, that General Electric Company's (GE) Midwest Fuel Recovery Plant for reprocessing spent nuclear fuel near Morris, Illinois, had been converted to a long-term storage facility for nuclear waste. Claiming "[t]here are significantly different environmental risks and possible alternatives that are not associated with a long-term storage facility that are not associated with a reprocessing-plant," the request alleged violations of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 *et seq.* and the Commission's regulations, 10 C.F.R. 50, Appendix F., No. 4. Also the request asserted that the conversion occurred because:

At the present time, there is a Presidential moratorium on the reprocessing of spent fuel and no technically proven method of safely and permanently disposing of spent fuel. Accordingly, the storage of spent fuel at the Morris facility must be considered a *de facto* permanent storage until a more satisfactory method of disposal has been adequately demonstrated.

For relief, Illinois asked the Commission to institute a proceeding to modify, suspend, or revoke GE's special nuclear material license,

grant Illinois and other interested parties a hearing, stay all spent fuel shipment to the Morris facility, prepare an environmental impact statement, and postpone consideration of the proposed expansion of the facility.

2. In his letter the director recounted the history of the licensing, construction, and operation of the Morris facility and stated that the Commission had complied with the National Environmental Policy Act and the Commission's own regulations. He also detailed the environmental analyses of the plant which previously determined that storage of spent fuel would not have an adverse impact on the environment. Denying the request the director concluded:

In view of the continued position of General Electric Company regarding the interim nature of its storage facility and the Federal Government's proposal to take title to spent fuel, there is no reason why the existence of another executive proposal for a moratorium on reprocessing should *ipso facto* make the Morris operation a *de facto* permanent storage facility.

amending of any license . . . the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding.

This section requires the NRC to hold hearings only after a formal proceeding has already begun, and petitioner concedes as much.[3] As there was no proceeding in this case and as the Act contains no provision for a hearing when no proceeding has been commenced under this section, the state is clearly without a right to a hearing.

■ Contrary to petitioner's contention the Administrative Procedure Act does not require the NRC to hold a hearing. The provision of the APA requiring hearings applies only to agency action which, according to that agency's governing statute, must be preceded by a hearing. *Robertson v. Federal Trade Commission*, 415 F.2d 49 (4th Cir. 1969); *LaRue v. Udall*, 116 U.S. App.D.C. 396, 324 F.2d 428 (1963). *See also Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The fact that the Atomic Energy Act does not require a hearing thus renders the hearing requirements of the APA inapplicable.

■ The Commission's own regulations, which set forth the procedures to be followed by the Commission in responding to enforcement requests such as this one by the state, are reasonable and consistent both with Section 189(a) of the Atomic Energy Act and Section 555(e) of the Administrative Procedure Act. Thus we regard the administrative interpretation as controlling. *Northern Indiana Public Service Co. v. Porter County Chapter of the Izaak Walton League of America*, 423 U.S. 12, 96 S.Ct. 172, 46 L.Ed.2d 156 (1975). Illinois asked the Commission to institute a proceeding pursuant to 10 C.F.R. 2.206(a) which provides in pertinent part:

Any person may file a request for the . . . Director of Nuclear Material Safety and Safeguards . . . to institute a proceeding pursuant to § 2.206 to modify, suspend or revoke a license, or for such other action as may be proper.

The director denied the request in accordance with 10 C.F.R. 2.206(b) which states:

Within a reasonable time after a request pursuant to paragraph (a) of this section has been received, the . . . Director of Nuclear Material Safety and Safeguards . . . shall either institute the requested proceeding in accordance with this subpart or shall advise the person who made the request in writing that no proceeding will be instituted in whole or in part, with respect to his request, and the reasons therefor.

Therefore the director complied with these provisions, as well as with Section 555(e) of the APA, by advising the state that no proceeding would be instituted and by presenting a complete statement of reasons supporting his decision to deny the request.

In *Dunlop v. Bachowski*, 421 U.S. 560, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975), the losing candidate in a disputed union election filed a complaint with the Secretary of Labor alleging violations of Section 401 of the Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 481. Pursuant to 29 U.S.C. § 482, the Secretary was compelled to investigate the complaint and decide whether to bring an action to set aside the challenged election.[4] After completing his investigation the Secretary, without holding a hearing, refused to institute a civil proceeding.

---

**3.** The petitioner states in its brief:

The mechanics of the NRC's rules are such that only the NRC staff may actually commence a proceeding involving a license: third parties may only request action. The NRC denied the request in this case.

In a strict literal sense, then, there was no formal "proceeding" in which the State could intervene as of right under Section 2239(a). . . .

**4.** Section 482(b) of 29 U.S.C. provides:

The Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this subchapter has occurred and has not been remedied, he shall . . . bring a civil action against the labor organization . . . to set aside the invalid election, if any.

The Supreme Court acknowledged the special knowledge and discretion of the Secretary and ruled out the need for a hearing on the Secretary's denial:

> The necessity that the reviewing court refrain from substitution of its judgment for that of the Secretary thus helps define the permissible scope of review. Except in what must be the rare case, the court's review should be confined to examination of the "reasons" statement, and the determination whether the statement, without more, evinces that the Secretary's decision is so irrational as to constitute the decision arbitrary and capricious. Thus, review may not extend to cognizance or trial of a complaining member's challenges to the factual bases for the Secretary's conclusion either that no violations occurred or that they did not affect the outcome of the election. The full trappings of adversary trial-type hearings would be defiant of congressional objectives not to permit individuals to block or delay resolution of post-election disputes, but rather "to settle as quickly as practicable the cloud on the incumbents' titles to office"; and "to protect unions from frivolous litigation and unnecessary interference with their elections." "If . . . the Court concludes . . . there is a rational and defensible basis [stated in the reasons statement] for [the Secretary's] determination, then that should be an end of this matter, for it is not the function of the Court to determine whether or not the case should be brought or what its outcome would be."

*Id.* at 573, 95 S.Ct. at 1860. Although detailed findings of fact were not necessary, the Court insisted that the Secretary provide a statement of reasons supporting his determination to serve as the basis for judicial review. Stating that the court of appeals impermissibly allowed an adversary trial to challenge the factual basis for the Secretary's decision, the Supreme Court reversed and remanded the case.

The Supreme Court in *Gulf States Utilities Co. v. Federal Power Commission*, 411 U.S. 747, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973), considered the discretionary authority of the Federal Power Commission (FPC or Commission) to refuse to hold a hearing. Gulf States Utilities Company (Gulf) applied to the FPC for authority to issue a security as required by Section 204 of the Federal Power Act, 16 U.S.C. § 824c. The Commission was thereby statutorily obligated to consider the issue's anticompetitive effect and compatibility with the public interest and was provided with the power to grant or modify such applications "after an opportunity for a hearing." [5]

After the FPC filed notice of Gulf's application, two Louisiana cities alleging anticompetitive consequences requested a formal hearing and leave to intervene on the application. The Commission granted intervention, denied the hearing and granted the application. The Court held that although the Commission was obligated to consider the anticompetitive consequences of a security issue, the FPC need not conduct a hearing on objections in every case. The Supreme Court announced, "So strict a rule would unduly limit the discretion the Commission must have in order to mold its procedures to the exigencies of the particular case." 411 U.S. at 762, 93 S.Ct. at 1880.

In *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978) the Court recently repeated a long established administrative law principle: "Even apart from the Administrative Procedure Act this Court has for more than four decades emphasized that the formulation of procedures was basically to be left within the discretion of the agencies to which Congress had confided the responsibility for substantive judgments."

---

**5.** Section 824c(b) of 16 U.S.C. provides:

The Commission, after opportunity for hearing, may grant any application under this section in whole or in part, and with such modifications and upon such terms and conditions as it may find necessary or appropriate, and may from time to time, after opportunity for hearing and for good cause shown, make such supplemental orders in the premises as it may find necessary or appropriate . . . .

Congress has indeed bestowed broad discretion upon the Commission. "Both the Atomic Energy Act of 1954 and the Energy Reorganization Act of 1974 confer broad regulatory functions on the [Nuclear Regulatory] Commission and specifically authorize it to promulgate rules and regulations it deems necessary to fulfill its responsibilities under the Acts." *Public Service Company of New Hampshire v. Nuclear Regulatory Commission*, 582 F.2d 77 (1st Cir., 1978). The Commission's regulatory scheme "is virtually unique in the degree to which broad responsibility is reposed in the administering agency, free of close prescription in its charter as to how it shall proceed in achieving the statutory objectives." *Siegel v. Atomic Energy Commission*, 130 U.S. App.D.C. 307, 312, 400 F.2d 778, 783 (1968).

In *Vermont Yankee* the court declared: Absent constitutional constraints or extremely compelling circumstances, "the administrative agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.'"

435 U.S. at 543, 98 S.Ct. at 1211. In the present case the record delineates neither a constitutional issue nor extremely compelling circumstances. The state has not carried its burden on the statutory claim.

## II.

██ In the alternative, Illinois claims that the Morris plant is a long term storage facility and that the Commission's refusal to institute a proceeding[6] is "arbitrary and capricious, an abuse of discretion, and not in accordance with law." 5 U.S.C. § 706(2)(A). The state complained in its brief:

[T]he NRC rejected the State's allegation that there was no technically known, demonstrated means of disposing of the spent fuel currently stored at the MFRP; plainly stated, the State contends that there presently is nowhere else for that spent fuel to go, that there is no demonstrated means to dispose of it, and probably will not be for some time.

The director responded to the same complaints in his letter with these comments: "[T]he Department of Energy has . . . announced a new spent fuel nuclear policy, stating that the Federal Government is proposing to accept and take title to used, or spent nuclear fuel."[7] The state contends that the Commission acted arbitrarily and capriciously in denying the state's allegations and refusing to take further action. We disagree.

The Second Circuit in *Natural Resources Defense Council, Inc. v. Nuclear Regulatory Commission*, 582 F.2d 166, 170 (2d Cir., 1978), discussed:

whether [the] NRC, prior to granting nuclear power reactor operating licenses, is required by the public health and safety requirement of the [Atomic Energy Act of 1954] to make a determination (in ac-

6. On appeal the state has narrowed its request to only a hearing. *See* footnote 1.

7. The Director also enclosed an October 18, 1977, Department of Energy announcement which read in part:

The new policy approved by the President is a logical extension, given the indefinite deferral of reprocessing, of the long-established Federal responsibility for permanent disposal of high-level wastes. The policy will also remove the uncertainty faced by utilities by having the Federal Government accept and take title to spent reactor fuel upon payment of a one-time storage fee. . . .

Under this new policy, spent fuel transferred to the U.S. Government must be delivered to a government-approved storage site at user expense. . .

In order to implement this policy, the government will need both interim and permanent spent fuel storage capacity. The Department of Energy will begin immediately discussions with private industry to determine whether suitable interim fuel storage services can be provided to the government on a contract basis. Utilities will be surveyed to provide an estimate of the amount and timing of spent fuel transfer to the government. If adequate private storage services cannot be provided, government interim fuel storage facilities would be required. . . .

The Department of Energy places high priority upon development of permanent disposal systems for nuclear wastes.

cordance with its rulemaking procedure) that high-level radioactive wastes can be permanently disposed of safely.

The court held that the Commission is required neither to conduct a rulemaking proceeding requested by a petitioner nor to determine that high-level radioactive wastes can be permanently disposed of safely prior to issuing nuclear power reactor operating licenses. Following an extensive review of legislative history, the court of appeals announced:

It is our conclusion that NRDC simply reads too much into the [Atomic Energy Act]. Indeed, if the [Atomic Energy Commission] had interpreted the statute to require the affirmative determination regarding permanent disposal of high-level waste sought by NRDC, no commercial production or utilization facilities would be in operation today. We are satisfied that Congress did not intend such a condition. If it did, the silence from Capitol Hill has been deafening.

582 F.2d at 171. The court concluded that Congress by enacting the Energy Reorganization Act of 1974, 42 U.S.C. § 5801 *et seq.*, "expressly recognized and impliedly approved" the Commission's regulatory scheme and practices governing the interim storage of high-level wastes. 582 F.2d at 174.

The Supreme Court in *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.* emphasized that the courts have a limited role in reviewing an agency's procedures and actions: "Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of an agency as to environmental consequences of its actions. . . *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1970)." 435 U.S. at 555, 98 S.Ct. at 1217.

In *Vermont Yankee* the Court answered an "arbitrary and capricious" argument in the negative stating: "Administrative decisions should be set aside . . . only for substantial procedural or substantive reasons as mandated by statute, *Consolo v. Federal Maritime Commission*, 383 U.S. 607,

620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)." 435 U.S. at 553, 98 S.Ct. at 1218. We have said we will determine:

whether "the decision was based on a consideration of all relevant factors and whether there has been a clear error in judgment." . . . We are not to set the effluent limitations ourselves or substitute our judgment for the agency's. . . . Rather, we are to determine whether the limitations set by the agency are "the result of reasoned decision-making."

*American Meat Institute v. Environmental Protection Agency*, 526 F.2d 442, 453 (7th Cir. 1975). In the case before us General Electric has not requested and the Commission has not issued a long-term license for spent fuel storage. In fact the existing short-term license for the Morris facility will expire August 31, 1979.

For the above reasons we affirm the Commission.