Geraldine JOHNSON, Appellee,

v.

Joseph A. CALIFANO, Secretary of
Health, Education and
Welfare, Appellant.

No. 77–3319.

United States Court of Appeals,
Sixth Circuit.

Argued April 5, 1979.

Decided Sept. 4, 1979.

Albert Jones, U. S. Atty., Louisville, Ky., Robert E. Kopp, Mary Gallagher, Joseph B. Scott, Dept. of Justice, Civil Div., App. Sect., Washington, D. C., for appellant.

Martin F. Sullivan, Jr., Louisville, Ky., for appellee.

Before ENGEL and KEITH, Circuit Judges, and PECK, Senior Circuit Judge.

JOHN W. PECK, Senior Circuit Judge.

The present appeal requires this Court to interpret the meaning of a "presumption of death," as that principle applies to the provisions of the Social Security Act. Plaintiff, Geraldine (Ross) Johnson, sought surviving child benefits for her daughter, Kathy M. Ross, pursuant to the provisions of the Social Security Act, 42 U.S.C. § 402(d)(1).[1] As a condition to receipt of these benefits, plaintiff was required to establish that Kathy's father, Danny D. Ross, was dead.[2] Because plaintiff could not prove the death of Ross by direct evidence, she relied on the presumption of death, set forth at 20 C.F.R. § 404.705. This presumption, contained in a regulation of the Secretary of HEW, operates as follows:

> Whenever it is necessary to determine the death of an individual in order to determine the right of another to a monthly benefit or a lump-sum death payment under section 202 of the Social Security Act, and such individual has been unexplainedly absent from his residence and unheard of for a period of 7 years, the Administration, upon satisfactory establishment of such facts and in the absence of any evidence to the contrary, will presume that such individual has died.

20 C.F.R. § 404.705(a).

After the Secretary initially denied plaintiff's application, a hearing was held before an administrative law judge (ALJ). Following completion of the hearing, the ALJ determined, first, that plaintiff had adequately established entitlement to a presumption of death under § 404.705, and second, that Danny Ross was presumed to have died on February 14, 1973. Although the decision of the ALJ was generally favorable to plaintiff's application, plaintiff appealed the decision on the ground that the ALJ had incorrectly set the date for the

---

1. 42 U.S.C. § 402 provides, in pertinent part:
   Every child (as defined in section 416(e) of this title) of an individual entitled to old-age or disability insurance benefits, or of an individual who dies a fully or currently insured individual, if such child—
   (A) has filed application for child's insurance benefits,
   (B) at the time such application was filed was unmarried and (i) either had not attained the age of 18 or was a full-time student and had not attained the age of 22, or (ii) is under a disability (as defined in section 423(d) of this title) which began before he attained the age of 22, and
   (C) was dependent upon such individual—

   (i) if such individual is living, at the time such application is filed, . . .
   (ii) if such individual had a period of disability which continued until he became entitled to old-age or disability insurance benefits, or (if he has died) until the month of his death, at the beginning of such period of disability or at the time he became entitled to such benefits, shall be entitled to a child's insurance benefit . . . .

   42 U.S.C. § 402(d)(1).

2. The surviving child benefits sought by plaintiff were based on the wage record of the child's father, Danny D. Ross.

award of benefits.[3] In its decision to grant review, the Appeals Council notified plaintiff that it would not limit its examination solely to the date of the award. Accordingly, the Council proceeded to review the entire record, and subsequently concluded that the essential findings of the ALJ were erroneous. In the Council's view, plaintiff had failed to prove that Danny Ross had been ". . . *unexplainedly* absent from his residence and unheard of for a period of 7 years . . .," as required by the Secretary's regulation. *See* 20 C.F.R. § 404.-705(a), *supra*. (Emphasis added.) Rather, according to the Council, the evidence of record provided "logical reasons" other than death to explain the prolonged absence of Ross. The Secretary adopted the findings and conclusions of the Appeals Council as his final decision. Plaintiff thereafter sought review in the district court, pursuant to the provisions of 42 U.S.C. § 405(g). The district court, following its own examination of the record, concluded that the Appeals Council had "applied too strict a standard in determining presumptive death." Based on this conclusion, the court reversed the decision of the Secretary and ordered that plaintiff's application for benefits be granted.

▇ The Social Security Act requires the federal courts to give deference to the factual findings of the Secretary of HEW. Specifically, § 405(g) of the Act provides:

The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . .

42 U.S.C. § 405(g). The term "substantial evidence," incorporated into § 405(g), has been defined as ". . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. N. L. R. B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). *See Universal Camera Corp. v. N.*

*L. R. B.*, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951). As this definition makes clear, the mandate of § 405(g) significantly limits the power of the federal courts to overturn the factual findings of the Secretary of HEW. At the same time, however, it is settled law that a federal court, in reviewing a final decision of the Secretary, must not abdicate its conventional judicial function, but "must take into account whatever in the record fairly detracts from [the] weight [of the evidence that supports the decision]." *Universal Camera Corp., supra*, 340 U.S. at 488, 71 S.Ct. at 464. In deciding whether the decision of the Secretary in the present case was supported by substantial evidence, this Court, first, must carefully analyze the evidence of record; second, must determine which party shouldered the burden of going forward as to the critical facts in dispute; and third, must assess the weight to be accorded the contrary findings of the ALJ.

### FACTS AND FINDINGS

The evidence of record indicates that plaintiff and her former[4] husband, Danny Ross, had a short-lived and tumultuous relationship. Plaintiff and Ross met in 1964, while both were in the Army. At the time of their meeting, Ross had been in the service for approximately eight years. Although the record indicates that Ross went "up and down in rank" during this period, the record also indicates that Ross, because of limited job skills, had little, if any incentive to leave his career in the Army. Further, the record does not contain any evidence that Ross experienced military problems of any kind immediately prior to his disappearance. Ross was a heavy drinker, and throughout the relationship between plaintiff and Ross, the couple was accustomed to violent physical fights. For example, at one time during their courtship,

---

**3.** Plaintiff argued that, because the date of her application was January 30, 1973, "with a retroactive life of one year," the effective date for the award of benefits should have been January, 1972.

**4.** Plaintiff and Ross were divorced by order of the Jefferson Circuit Court, Chancery Branch, Louisville, Kentucky, entered March 26, 1971. In her complaint in the divorce proceedings, plaintiff stated that Ross had behaved in such a cruel and inhuman manner as to indicate "a settled aversion to her."

Ross attacked and severely choked plaintiff. Despite their difficulties, plaintiff and Ross were married in December 1964, at which time plaintiff was five months pregnant with Kathy. The last time plaintiff saw Ross was in 1965, when Ross visited his two-week old daughter. In the course of this final visit, Ross apparently showed no fatherly affection for his new-born child. In fact, Ross allegedly spent a part of the visit at a house of ill-repute. The last time plaintiff received word from Ross was in November 1965, when Ross sent plaintiff a letter from his service post in Germany.

Early in 1966, the Army reassigned Ross, then a sergeant, to a new service post in Thailand. Along with his reassignment, Ross received authorization to spend thirty days' leave in the United States. He was scheduled to report to San Francisco on February 10, 1966, but he failed to report as required. The last known trace of Ross dates to February 14, 1966, the day on which he picked up his Army paycheck in Washington, D.C. At that time, Ross was twenty-eight years old. The Army reported Ross as AWOL on March 3, 1966, and he has been listed as a deserter since April 1, 1966. Searches by the Army and the F.B.I. have failed to turn up any present record of Ross. Further, since the time of his disappearance, there have been no wage earnings reported under Ross' social security number. Finally, Ross' parents have received no word from their son, in spite of the fact that Ross was allegedly a "mama's boy," who, according to his parents' testimony, "wrote [them] often before his disappearance." [5]

From the above evidence, and after the completion of a hearing, the ALJ announced that "claimant had done as well as can reasonably be expected under the circumstances in establishing the lack of motive on the part of the [wage earner] to purposely conceal himself." The Appeals Council, following a review of the record, rejected this conclusion of the ALJ. In so doing, the Council reasoned that Ross may have disappeared either to avoid court martial for desertion or to escape the difficulties that had existed in his marriage. Based on this reasoning, the Council concluded that the disappearance of Ross was not an "unexplained" absence, as required by § 404.705. The Council said:

> It is clearly stated in the Regulations that a presumptive finding of death is applicable only when the wage earner has been absent without explanation from his residence and unheard of for a period of seven years. Where the circumstances surrounding the disappearance of the missing person are such that his absence can be reasonably explained without inferring his death, his absence, notwithstanding its duration, is not "unexplained" within the meaning of the Regulations. The presumption of death has no applicability where the evidence of record supplies a logical reason, other than death, to explain the absence.

### BURDEN OF GOING FORWARD

In deciding whether the Secretary's denial of benefits was supported by substantial evidence, it is relevant to determine which party bore the burden of going forward as to the critical facts in dispute. In this regard, the Secretary contends that plaintiff failed to establish entitlement to a presumption of death because she failed to exclude all logical reasons other than death for the wage earner's disappearance.[6] We

---

**5.** The dissent herein reasons that various references to Ross made in the present tense by plaintiff and Ross' parents indicate that these parties in fact believe that Ross is still alive. We can accord no weight to these "present tense" references. In his letter of concurrence in this opinion, Judge Keith aptly expressed our views:

> "Where a disappearance is mysterious, it is only natural to preserve hope that the missing person is still alive and to refer to him as

such. Witness the situation with the MIAs from the Vietnam war. Little hope remains that any of them are still alive, but few of their families refer to them as deceased."

**6.** We acknowledge the principle that the courts are " 'obligated to regard as controlling . . . a reasonable, consistently applied administrative interpretation. . . .' " *Northern Indiana Public Service Co. v. Porter County Chapter of the Izaak Walton League of America,*

disagree. If the Secretary's analysis was correct, a social security applicant who attempted to establish presumptive death would labor under a nearly impossible burden of proof.

The purpose of establishing a presumption of death is to introduce a degree of finality into human dramas which, by their nature, are laden with ambiguities. Invariably, such ambiguities invite plausible speculation. It would, therefore, be unreasonable to require a social security applicant to refute every possible explanation other than death for a wage earner's disappearance, as a condition to gaining entitlement to the § 404.705 presumption. Both in theory and in practice, an applicant would be able to satisfy such burden only by presenting direct evidence of death.[7] Yet, the very reason for the presumption is to provide a means of establishing death when direct evidence is not available. We agree with the position taken by the Ninth Circuit in *Christen v. Secretary of HEW*, 439 F.2d 715 (9th Cir. 1971). " 'We cannot go along with the Department's apparent view that one achieves immortality' by disappearing under circumstances not free from doubt." *Aubrey v. Richardson (Secretary of HEW)*, 462 F.2d 782, 785 (3rd Cir. 1972), *quoting, Christen, supra*, 439 F.2d at 715. In other words, if this Court were to accept the Secretary's contention as to the burden of proof under § 404.705, the presumption of death thereunder would be incorrectly transformed into a presumption of eternal life.[8]

■ Although most prolonged disappearances do not lend themselves to clear-cut explanations, it can be stated with certainty that people do not normally sever all relationships and disappear without a trace for a period of seven years. This fact leads us to adopt the following rule, now followed by both the Ninth and the Third Circuits.[9] When a social security applicant presents facts that establish that a wage earner has been absent from his residence and unheard of for a period of seven years, a presumption of death arises under Regulation § 404.705.[10] *Accord, Secretary of HEW v. Meza*, 368 F.2d 389, 392 (9th Cir. 1966); *Aubrey v. Richardson (Secretary of HEW), supra*, 462 F.2d at 784. *See Blew v. Richardson (Secretary of HEW)*, 484 F.2d 889 (7th Cir. 1973). The burden then shifts to the Secretary to make an affirmative showing either that the "missing person is alive" or that "the anomaly of the disappearance . . . [is] consistent with continued life." *Meza, supra*, 368 F.2d at 392.

■ In the present case, the record shows that plaintiff established that her former husband, Danny Ross, had been absent without a trace for a period of more than seven years. Searches by the F.B.I. and the Army, for example, failed to uncover any record of Ross after February 14, 1966.

Inc., 423 U.S. 12, 15, 96 S.Ct. 172, 174, 46 L.Ed.2d 156 (1976), *quoting, Ehlert v. United States*, 402 U.S. 99, 105, 91 S.Ct. 1319, 28 L.Ed.2d 625 (1971).

7. The Ninth Circuit has rejected the Secretary's "literal reading" of § 404.705 on the ground that it "would place an impossible burden of showing a negative upon an applicant." *Secretary of HEW v. Meza*, 368 F.2d 389, 392 (9th Cir. 1966).

8. The dissent herein reasons that Danny Ross, who would have been 37 years old at the time of the Appeals Council's decision, "does not have to be immortal to be alive under such circumstances." This analysis, however, ignores the fact that the "logical reasons" found by the Appeals Council to prevent the operation of presumptive death exist not only in the present, but may well exist for all eternity.

9. Although the court in *Blew v. Richardson (Secretary of HEW)*, 484 F.2d 889 (7th Cir. 1973), did not directly confront the issue of the burden of proof under § 404.705, it appears from the language of that decision that the Seventh Circuit may also be in agreement with the rule we adopt today. 484 F.2d at 892.

10. We believe this rule is consistent with the common-law origin of the presumption of death. At common law, when a seven-year absence occurred, the ordinary presumption of ongoing life ceased and the presumption of death arose. *See Doe v. Jesson*, 6 East 80, 102 Eng.Rep. 1217 (1805); J. Thayer, *A Preliminary Treatis on Evidence at the Common Law* 323 (1898).

The burden thus shifted to the Secretary to rebut the presumption which plaintiff had initially established. In short, the Secretary carried an affirmative burden of going forward with substantial evidence to explain Ross' disappearance in a manner consistent with his continued life. Of course, because the Secretary carried this burden of going forward, his evidentiary obligations were more substantial.

## CONTRARY FINDINGS OF THE ALJ

■ It is undisputed that the Secretary of HEW has the power to accept or reject the findings and conclusions of an ALJ. However, in *Beavers v. Secretary of HEW*, 577 F.2d 383, 387 (6th Cir. 1978), this Court held that the contrary findings of an ALJ were "an important factor to consider" in deciding whether the final decision of the Secretary of HEW was supported by substantial evidence. In *Beavers*, the Court reasoned that:

> The opportunity [of the ALJ] to observe the demeanor of a witness, evaluating what is said in the light of how it is said, and considering how it fits with the rest of the evidence gathered before the person who is conducting the hearing, is invaluable, and should not be discarded lightly.

It is true that in the present case the credibility of witnesses was not as relevant to the decision of the Secretary, as it was in the *Beavers* case. In *Beavers*, the sole issue on appeal was whether a claimant was totally disabled from various back, leg and head pains. The ALJ therein found total disability based, in part, on the personal testimony of the claimant. Nonetheless, the present case is not fundamentally distinguishable from *Beavers*. Witness testimony did play a substantial role below. For example, the demeanor and testimony of plaintiff was directly relevant to the Secretary's determination that plaintiff's former husband may have vanished in order to escape certain difficulties in his marriage. Accordingly, the contrary findings of the ALJ are again "an important factor" for this Court to consider in its review of the Secretary's final decision. Consistent with the teachings of *Universal Camera Corp., supra,* 340 U.S. at 488, 71 S.Ct. 456, we hold that the findings of the ALJ "fairly detract from [the] weight" of the evidence relied upon by the Secretary.

## CONCLUSION

■ In light of the fact that the Secretary carried the burden of rebutting the presumption of death, and in the light of the contrary findings of the ALJ, we conclude that the Secretary's denial of plaintiff's application was not supported by substantial evidence. Once plaintiff initially established entitlement to the presumption of death, the Secretary was required to rebut the presumption by evidence that gave rise to positive explanations for the wage earner's disappearance. We find that the Secretary failed to present such evidence. It is true that the record before us establishes that the wage earner Ross experienced severe marital and career difficulties. It is also true "that pre-departure evidence may support a finding that the wage earner's absence is not unexplained." *Blew v. Richardson (Secretary of HEW), supra,* 484 F.2d at 893. However, in every person's life there are difficulties which could, in the event of a disappearance, inferentially provide plausible explanations for an absence. Thus, evidence that such difficulties exist, taken alone, cannot adequately rebut a presumption of death. The Secretary is obligated to establish a more direct connection between the pre-departure difficulties and the proposed explanation of flight. In summary, when a social security applicant initially establishes entitlement to a presumption of death, the Secretary of HEW can rebut the presumption only by evidence that directly points to an explanation other than death for the wage earner's disappearance. *See, e. g., Dowell v. Gardner (Secretary of HEW),* 386 F.2d 809 (6th Cir. 1967) (In *Dowell,* the Court concluded that there was substantial evidence to support the Secretary's finding that the wage earner had simply abandoned his household. However, the wage earner in *Dowell* had had a previous history of

desertion and unexplained absences. Further, he had been arrested for assault and battery during the marriage, had served ten days in jail for nonsupport of his family, and had burned the family home. Finally, the wage earner, according to earnings' records, had been employed for a two-year period subsequent to the time he had allegedly abandoned his family. These various pieces of evidence provided a direct link between the wage earner's marital difficulties and the Secretary's explanation of flight.)

The judgment of the district court is affirmed.

ENGEL, Circuit Judge, dissenting. I respectfully dissent.

For all practical purposes the majority would amend 20 C.F.R. § 404.705(a) to delete therefrom the term "unexplainedly".

The findings of the Secretary are, in my opinion, supported by substantial evidence and they should, therefore, be conclusive as contemplated by the statute. Danny Ross' disappearance was very explainable indeed. If anything, the facts cited in the majority opinion here are stronger than those which brought about our affirmance of the Secretary's decision in *Dowell v. Gardner (Secretary of HEW)*, 386 F.2d 809 (6th Cir. 1967), cited by the majority. There is even more.

It must be remembered in the first instance, as the Appeals Council found, that Geraldine Johnson's testimony before the Administrative Law Judge was heavily discredited by the record in the divorce proceedings which she instituted several years after Danny Ross disappeared. While she testified before the Administrative Law Judge that she and Danny had parted on good terms and that he dearly loved the baby, her petition for divorce and supporting documents showed precisely the opposite:

> The defendant has habitually behaved toward me . . . in such a cruel and inhuman manner as to indicate a settled aversion to me . . . . The last time I saw the defendant was when our baby was two weeks old and he was home on leave from the U.S. Army. . . . He left to go back to Washington, D.C. and left without saying a word to either me or showing any fatherly affection toward our newborn daughter. My grandfather told me that I was in the hospital having our baby and he was staying at a house of Ill Repute. One of the ladies that was employed there came by my grandfathers home and told him the defendant was suppose to sent for her. . . . The defendant has mistreated me in the past. He was drinking and he choked me. His first sergeant pulled him off of me. I guess he would have killed me if it had not been for this man being with him. The defendant has been gone for over three years and has made no attempt to see our baby. Even his parents have never seen our child, since she was three months of age. . . . I had to write the Commanding officer in order to get support in 1965 as he was gone for 7 months and I did not have any money at all.

Further, an affidavit of one Rose Bowles submitted with the petition for divorce and included in the record before the Secretary, corroborated Mrs. Johnson's statements and observed that "The defendant did not pay any attention to their newborn baby." It is indeed unfortunate, but Ross' utter indifference to his family is firmly a matter of record.

Contrary to Mrs. Johnson's assertion in her testimony at the hearing, there is no support for the fact that Ross was a "mama's boy" whose failure to contact his parents indicated his possible death. In answer to inquiries made of the parents, Curtis and Opal Ross, they stated that they had not seen him since November, 1963, although he is known to have been alive and in the United States as late as February 14, 1966. Further, in answer to inquiries made on March 9, 1973, Curtis Ross answered: "Unknown" to the question "Do you believe that the missing person is dead?" In a statement dated July 30, 1973, Mrs. Opal N. Ross, also answered, "Unknown" to that question.

Confirmation that the claimant herself may very well believe that Danny Ross still lives is found in the record, albeit indirectly. During the course of a colloquy between herself, the Administrative Law Judge and her attorney, Mrs. Ross, in what was obviously a slip-up, observed concerning her husband,

He doesn't even know that I'm divorced, I don't guess.

This tendency to deal with him as presently living is not isolated. Thus, in her divorce proceedings, Geraldine was even willing to swear under oath on September 15, 1969, that:

The defendant is now in the army and has been during the pendency of this action.

Likewise, the further affidavits of Mrs. Johnson and of Rose Bowles all refer to the defendant in the present tense. Mrs. Johnson, while indicating her surprise that Ross had not contacted his parents, at the same time with some candor admitted at the hearing that Ross' mother "wouldn't turn him in if he was on AWOL. He knows that." Admittedly these are not controlling circumstances, but they are part of the overall proof which strikes me as a classic example of the kind of "substantial evidence" required to support the Secretary's decision and to shield that decision from judicial disagreement.

Finally, the majority's observation, from *Christen v. Secretary of HEW*, 439 F.2d 715 (9th Cir. 1971), that "We cannot go along with the Department's apparent view that one achieves immortality by disappearing under circumstances not free from doubt" is not valid here. The Secretary expressly found that at the time of his disappearance, Danny Ross was 28 years of age and apparently in good health. He would only have been 37 years old at the time of the Appeals Council decision of the case, and this was as it observed "Well within a normal lifespan." Danny Ross does not have to be immortal to be alive under such circumstances.

I see nothing about the rule nor about the Secretary's application of it to the facts here to suggest that his action is tanta-mount to transforming the presumption of death into a presumption of eternal life. On the contrary, it is a realistic and straightforward application of rules of evidence in a determination which Congress has left to the Secretary and in which our role of review has been intentionally limited by Congress.