**Audrey GROSSMAN and Connie Grossman, Plaintiffs,**

v.

**Otis R. BOWEN, Secretary of Health and Human Services, Defendant.**

No. 86 Civ. 2577 (RLC).

United States District Court, S.D. New York.

Jan. 15, 1988.

Mudge Rose Guthrie Alexander & Ferdon, New York City, for plaintiffs; Keith M. Merriwether, III, of counsel.

Rudolph W. Giuliani, U.S. Atty., S.D. N.Y., New York City, for defendant; Diogenes P. Kekatos, Sp. Asst. U.S. Atty., Annette H. Blum, Chief Counsel, Region II, Curtis Axelsen, Asst. Regional Counsel, Office of the General Counsel, U.S. Dept. of Health and Human Services, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Jack Grossman has not been seen by his family since March 24, 1977. In this action, his former wife, Audrey Grossman, and his daughter, Connie Grossman, appeal from a decision of the Secretary of Health and Human Services ("the Secretary") denying them survivors' insurance benefits based upon Grossman's earnings. The question presented is whether the plaintiffs are entitled to a presumption that Jack Grossman is dead. Both the plaintiffs and the Secretary have moved for an order granting judgment on the pleadings pursuant to Rule 12(c), F.R.Civ.P.[1]

*Background*

In May, 1984, Audrey and Connie Grossman applied for survivors' insurance benefits under Sections 202(d) and (g) of the Social Security Act, 42 U.S.C. §§ 402(d) & (g), which provide for benefits to a child and divorced spouse of a deceased wage earner.[2]

Ordinarily, a claimant who seeks survivors' benefits must provide the Secretary with evidence of the date and place of the wage earner's death. 20 C.F.R. § 404.720(a) (1987). If proof of death cannot be obtained, the Secretary will assume that the wage earner is dead if the claimant presents the following:

.... Signed statements by those in a position to know and other records which show that the person has been absent from his or her residence *for no apparent reason*, and has not been heard from, for at least 7 years. If there is no evidence available that he or she is still alive, we will use as the person's date of

---

1. In the alternative, the plaintiffs request that this case be remanded to the Secretary with instructions to render judgment in their favor.

2. Section 202(d), 42 U.S.C. § 402(d), provides that benefits may be given to "[e]very child ... of an individual entitled to old-age or disability insurance benefits, or of an individual who *dies*

a fully or currently insured individual...." (emphasis added)

Section 202(g), 42 U.S.C. § 402(g), permits benefits to be given to "[t]he surviving spouse and every surviving divorced parent ... of an individual who *died* a fully or currently insured individual...." (emphasis added)

death either the date he or she left home, the date ending the 7 year period, or some other date depending upon what the evidence shows is the most likely date of death.

20 C.F.R. § 404.721(b) (1987) (emphasis added).

Lacking proof that Grossman was dead, the plaintiffs relied upon the presumption-of-death regulation. Their applications were denied, both initially and upon reconsideration.[3] The plaintiffs then requested a hearing to have their claims reviewed.

At the hearing, they introduced signed statements and other records documenting that Grossman had been absent from his residence and not been heard from for over seven years. On December 5, 1985, Administrative Law Judge Irwin M. Portnoy ("the ALJ") ruled that the plaintiffs had not presented convincing evidence that the wage earner was dead and, furthermore, were not entitled to a presumption of death.[4] In the ALJ's view, "[t]here are numerous ... reasons [other than Grossman's death] that would provide a reasonable and plausible basis for the wage earner to remain mute." Administrative Record ("A.R.") at 13. The opinion of the ALJ became the final decision of the Secretary when the Appeals Council denied the plaintiffs' request for review.[5] *See* 20 C.F.R. § 404.970 (1987). This action ensued. *See* 42 U.S.C. § 405(g).[6]

In this appeal, the plaintiffs argue that the evidence adduced below is sufficient to raise a presumption of death. The Secretary maintains, however, that the plaintiffs have failed to raise that presumption because they have not excluded the possibility of rational explanations other than death for the wage earner's disappearance. He argues, moreover, that if the presumption did arise, he has rebutted it.

*The Administrative Record*

The documentary and testimonial evidence adduced below showed the following: Audrey and Jack Grossman were married on October 19, 1948. They settled in Brooklyn, New York, where Grossman had lived all of his life. During sixteen years of marriage, the Grossmans had three children: Edward, born in October, 1949; Andrea, born in 1953; and Connie, born in April, 1962. The record reveals little about the Grossmans' marriage before 1960, when Andrea was killed in a hit-and-run accident at the age of seven. After Andrea's death, Audrey Grossman felt compelled to leave Brooklyn, and the Grossmans moved to Ossining, New York. Grossman continued to commute to his job in Brooklyn. After a year in Ossining, he moved back to Brooklyn and remained there until he disappeared in March, 1977.

For nearly eighteen years, Grossman worked at the Sea Gull Restaurant in Brooklyn. He was a short-order cook and counterman and a member for nearly twenty-five years of the Cooks Countermans Union, AFL Local 325. By all accounts, Grossman loved his work. Audrey testified at the hearing that Grossman "took a lot of pride in his work. He was punctual. He would always get [to work] early rather

---

**3.** The plaintiffs also applied for benefits in August, 1978, but their applications were denied for lack of proof of Grossman's death. Administrative Record "A.R." at 111, 113.

**4.** The ALJ made the following factual findings: (1) The claimant's [sic] are the legal divorced wife and legitimate child of the wage earner; (2) The wage earner has not been heard from for seven consecutive years; (3) The claimants have not presented convincing evidence that the claimant [sic] is dead; (4) The hypothesis advanced for the wage earners [sic] disappearance does not convince the Administrative Law Judge to infer that the wage earner is dead. A.R. at 13.

**5.** "The Appeals Council will review a case if—(1) There appears to be an abuse of discretion by the administrative law judge; (2) There is an error of law; (3) The action, findings or conclusions of the administrative law judge are not supported by substantial evidence; (4) There is a broad policy or procedural issue that may affect the general public interest." 20 C.F.R. § 404.970.

**6.** Congress has provided that "[a]ny individual, after any final decision of the Secretary made after a hearing to which he was a party, ... may obtain a review of such decision by a civil action commenced.... in the district court of the United States for the judicial district in which the plaintiff resides...." 42 U.S.C. § 405(g).

than late and stay late rather than leave on time." A.R. at 41. When he had free time, "[h]e went back to work and worked extra.... Everything was connected around that little nucleus of the job." *Id.* at 63. Edward testified that Grossman "was ... the pillar of the [restaurant]. He lasted 20 some odd years. He lasted longer than three groups of owners. He lasted through fires.... [H]e always prided himself in going to work.... I never saw him miss a day." *Id.* at 75. His social life revolved around the restaurant, where virtually all of his friends were employed, and he was regarded as one of the best workers in the union. *Id.* at 41.

The Grossmans were divorced on December 5, 1964, by a Mexican court that declared that they had incompatible temperaments.[7] The divorce was amicable. Grossman maintained close ties to his family thereafter. He visited his children regularly and, in accordance with a New York family court order, made child-support payments for Connie. On two occasions, in 1969 and in 1974, Grossman failed to make the required payments. In 1971, Audrey obtained a court order to compel him to meet his child-support obligations. Nonetheless, she later characterized his payments over the years as "generally prompt." *Id.* at 258.

The record shows that Grossman was faithful in meeting one other recurring financial obligation to his family: the expense of maintaining Andrea's grave. Before he disappeared, Grossman never failed to make these payments. On one of his last visits with Connie, he told Audrey that the day he stopped paying would be the day that he died. *Id.* at 52, 70, 259.

In 1967, Grossman married Gloria Hopstock, a waitress at the Sea Gull Restaurant. Nine years later, Gloria died after a long struggle with cancer. She was forty-seven years old. Grossman's father had died of cancer in 1964. Both deaths were terrible ordeals for Grossman. *See id.* at 52–54, 88–89, 257.

On March 21, 1977, Grossman called Audrey and requested to see her and their children for the last time. Audrey testified that she "respected [his request], because he'd never asked anything that seemed so urgent before." *Id.* at 55. The family met for dinner three days later at a restaurant in New Jersey. Grossman, the plaintiffs, Edward, and his wife, Zelda, were present. The location was selected for its convenience for Zelda, who was suffering from terminal spinal cancer and could not travel long distances.[8] Over dinner, Grossman told his family that he was seeing them for the last time. He said that his reasons would be made clear in a subsequent letter. *Id.* at 59.

After dinner, Grossman invited his family to accompany him to his room at a nearby motel. Once they were assembled there, he gave each of them a gift: Audrey received flowers, a card, and jewelry; Edward and Zelda received watches; and Connie received a mink stole that had once belonged to Gloria. Grossman called these gifts going-away presents.[9] *Id.* at 56–57. In the room was Grossman's luggage, including one piece that contained medicine bottles, some of which bore Gloria's name. Audrey testified that one bottle appeared to contain morphine. *Id.* at 58. In the motel room, Grossman told her that "[t]his is what's keeping me going," and then gestured by raising both of his hands. *Id.*

---

**7.** Audrey testified that the "final straw" that ended the marriage was Grossman's inability to leave Brooklyn to build a new life and accept a "business opportunity" in Westchester County. A.R. at 49. In discussing his views on why his parents were divorced, Edward said: "I think what probably broke up the marriage is that my father.... really wanted to stay where he was secure." *Id.* at 85.

**8.** Zelda died four months after the family's final meeting. *Id.* at 51.

**9.** Edward testified that Grossman, apparently shortly before he disappeared, entrusted his sister with some prized possessions that he wanted given to Edward: a cigar box containing the children's handmade presents, which Grossman had saved for many years, and a silver belt buckle engraved with the initials "J.G." *Id.* at 96.

Audrey further testified that Grossman "didn't quite look the same" that evening. *Id.* at 56. He had grown a beard. "His face was drawn and he had ... a little tic in the cheek.... I didn't know what it was then." *Id.* Edward testified that Grossman looked "small ... drawn and thin.... [N]ot enough to make me think he was sick, but [enough] to make me think that something was wrong. Also, he had this ... nervous twitching in his face and he told us it was tic douloureaux [sic]." *Id.* at 80.

The family pleaded with Grossman to explain what was wrong, but he refused, *id.* at 59, and eventually they left him. Later that evening, Edward phoned his father and implored him to spend the night at his house. The attempt failed. *Id.* at 81–82.

Five days later, Audrey received a nine-page handwritten letter from Grossman dated March 25, 1977, and postmarked Johnstown, Pennsylvania. Edward's address had been given as the return address. In the letter, Grossman revealed his belief that he was dying:

My Darling Audrey,

.... Well, here is my sad story. It started a few months ago. The first signs were numbness in my fingers. I went to a local doctor in Brighton and he diagnosed it as arthritis. When the second symptoms appeared I really got worried. Tingeling [sic] on my left side. (Pardon the spelling as I am half bombed.) Following the tingeling [sic] there was slight paralysis on my left side. That was enough to send me to a specialist. (Now the pain in my face becomes secondary.) He put me through every kind of test including a brain scan. When the results of the tests were concluded, they were not favorable. Do you recall what my father died of? It was a malignant brain tumor. All the signs point to me having the same problem.

*Id.* at 167–168.

Grossman explained that he was leaving "to save everyone from going through a serious illness with a loved one. I know how painfull [sic] it is having experienced it myself with Gloria." *Id.* at 169. In an apparent reference to Zelda's illness, Grossman added that "Eddie doesn't need that extra burden now." *Id.*

Grossman repeatedly expressed anxiety over how his children should be told that he was leaving, and he advised Audrey to consult doctors at her place of employment [10] for guidance "as to the least harmful way to inform your children that their father has gone for good because of his terminale [sic] illness." *Id.* at 170. He wanted Edward and Connie to "remember us the way we were in the room at the motel," and he explained that he had "tried to make [their] last meeting as pleasant as possible." *Id.* at 170–171. Finally, he wrote that "[w]hen and if the time comes for me to go, I will be somewhere in a distant state under an assumed name." *Id.* at 171. "All the expensive gifts I gave to everyone was [sic] bought on credit which I will never pay. All I have to my name is a few hundred dollars. When that is gone I will wait for the end to come and I will be gone forever." *Id.* at 171.

In the month following his disappearance, Grossman's sister, Doris Grossman Kaner, received three blank postcards from him. None had a return address. The first had been sent from Pennsylvania; the second from Chicago, Illinois; and the third from Colorado. There is no evidence in the record that anyone who knew Jack Grossman has seen or heard from him since these postcards were received. In January, 1978, Audrey received for the first time a bill for the upkeep of Andrea's grave. *Id.* at 70, 259.

Audrey made extensive efforts to locate Grossman: (1) She filed a missing person report in April, 1977 at the 61st Police Precinct in Brooklyn, but the police never located Grossman and later closed his file

---

**10.** At the time, Audrey Grossman was a music therapist working with psychiatric patients at a hospital in Westchester County.

as "unfounded",[11] *id.* at 181; (2) she spoke to Grossman's employer and coworkers at the Sea Gull, but no one there had heard from Grossman since March, 1977, or knew of his location; (3) she wrote, called, or visited every hospital listed in the Brooklyn Yellow Pages but failed to find Grossman's medical records; (4) she called or visited numerous neurologists, neurosurgeons, and other doctors who practiced within Grossman's neighborhood but again failed to locate his records; (5) she spoke to union officials, who told her that Grossman was no longer a member of his union and had not been seen or heard from since March, 1977 [12]; (6) she consulted private detectives but could not afford their services; (7) in May, 1978, she paid twenty dollars to the Parent Locator Unit of the Department of Social Services in White Plains, New York, to have a search for Grossman conducted, but no results were obtained; (8) in January, 1979, she contacted her Congressman's office for assistance; (9) that same month, she and Connie appeared on a local television show to broadcast their search for Grossman; (10) remembering that Grossman had a rental car when he was last seen, she contacted car rental agencies listed in the Brooklyn Yellow Pages but uncovered no leads; (11) finally, after walking from pharmacy to pharmacy in Grossman's neighborhood, she found a pharmacist who recalled filling out his prescriptions, but no records of the transactions were available. Thus, all efforts to locate Grossman or to confirm his purported illness have failed.

*Discussion*

The Secretary maintains that a presumption of death does not properly arise as long as he believes that there is a rational explanation for the wage earner's disappearance that is consistent with continued life. He argues that there are numerous such explanations for Grossman's disappearance, and that even if a presumption of death has been raised, he has introduced sufficient evidence to rebut it. Furthermore, the Secretary contends that his interpretation of the social security regulations is determinative.

■ Ordinarily, an administrative agency's interpretation of its own regulations is entitled to great deference from a reviewing court, *Edwards v. Califano,* 619 F.2d 865, 868 (10th Cir.1980), and should not be set aside unless it is plainly erroneous or inconsistent with the controlling regulation or statute. *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). An agency's interpretation is not entitled to great deference, however, if it rests upon general common-law principles and not upon expertise within the agency's particular field. *Edwards v. Califano,* 619 F.2d at 869; *Jicarilla Apache Tribe v. Fed. Energy Regulatory Comm'n,* 578 F.2d 289, 292 (10th Cir.1978); *see Texas Gas Transmission Corp. v. Shell Oil Co.,* 363 U.S. 263, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960) (where decision did not rest on commission's special competence, court was free to determine the governing principles).

■ There is no doubt that the presumption-of-death regulation rests upon general common-law principles. "At common law, when a seven-year absence occurred, the ordinary presumption of ongoing life ceased and the presumption of death arose." *Johnson v. Califano,* 607 F.2d 1178, 1182 n. 10 (6th Cir.1979); *see Blew v. Richardson,* 484 F.2d 889, 892 (7th Cir. 1973) (Stevens, J.) (the "regulation is quite obviously based on the common law presumption"); Annotation, *Presumption of Death From Absence, in Proceedings for Social Security Benefits,* 1 A.L.R.Fed. 753, 754 (1969) (regulation "generally sets forth the same considerations as were found in common law"); 22 Am.Jur.2d *Death* § 304 (1965) (U.S. presumption-of-death statutes are modeled after English common law). As a result, the Secretary's interpretation need not be accorded special weight.

---

**11.** Attempts to determine the meaning of the term "unfounded" have failed. *See* Plaintiffs' Mem., March 9, 1987, at 10 n. 12.

**12.** The record shows that Grossman never filed a claim for union benefits following his disappearance in March 1977. *Id.* at 283.

The Secretary argues that even if his interpretation does not govern, the court should interpret the regulation to require the plaintiffs to exclude all rational explanations other than death before the presumption may arise. As the Secretary himself concedes, *see* Def.'s Mem., May 20, 1987, at 17, five Circuits have taken a contrary view. *See Autrey v. Harris,* 639 F.2d 1233, 1234 (5th Cir.1981) (per curiam) ("[n]othing in the regulation requires the claimant to refute every reasonable theory or explanation offered by the Secretary"); *Edwards v. Califano,* 619 F.2d at 869 (presumption arises upon showing that wage earner has been absent from his residence and unheard of for seven years); *Johnson v. Califano,* 607 F.2d at 1182 (same); *Aubrey v. Richardson,* 462 F.2d 782, 784 (3d Cir.1972) (nothing in the regulation requires claimant to refute every reasonable theory or explanation the Secretary may suggest); and *Secretary of Health, Educ. and Welfare v. Meza,* 368 F.2d 389, 392 (9th Cir.1966) (the most the applicant can be expected to do is to show that she has no explanation for the wage earner's absence).

■ The cases cited by the Secretary do not hold otherwise. Two of the cases, *Blew v. Richardson,* 484 F.2d 889 (7th Cir. 1973) (Stevens, J.), and *Gardner v. Wilcox,* 370 F.2d 492 (9th Cir.1966), concern primarily the proof required to rebut the presumption, not the proof required to raise it. Both assume that the presumption arises upon a showing that the wage earner has been absent and unheard from for a period of seven years. *See Blew,* 484 F.2d at 892; *Gardner,* 370 F.2d at 494 (citing *Secretary of Health, Educ. and Welfare v. Meza,* 368 F.2d 389 (9th Cir.1966)). The other case relied upon by the Secretary is distinguishable from the instant one. In *Dowell v.*

*Gardner,* 386 F.2d 809 (6th Cir.1967), the court denied benefits because there was substantial evidence that the wage earner had deserted his family. The wager earner had a previous record of desertions and unexplained absences; was known to have been alive and working after his disappearance; faced divorce proceedings in which his wife alleged physical assault, extreme cruelty, and gross neglect; had been jailed for nonsupport; and had burned down the family's house-trailer. The record in the instant case is devoid of similar facts.[13]

■ Although our own Court of Appeals has deferred judgment on "either the standard for raising or [the standard] for rebutting the presumption," *see Mando v. Secretary of Health and Human Services,* 737 F.2d 278, 281 (2d Cir.1984), it has stated that *Secretary of Health, Educ. and Welfare v. Meza,* 368 F.2d 389 (9th Cir.1966), and its progeny hold that "to raise the presumption a claimant apparently need show only that the wage earner has been absent and unheard of for at least seven years." *Mando v. Secretary of Health and Human Services,* 737 F.2d at 281. The court believes that this standard is the proper one for raising a presumption of death. Because the plaintiffs made the requisite showing,[14] they succeeded in raising a presumption that Grossman is dead.

A requirement that the plaintiffs preclude the possibility of every alternative explanation for the wage earner's disappearance would place upon them a nearly impossible burden of proof. *See, e.g., Johnson v. Califano,* 607 F.2d at 1182; *Secretary of Health, Educ. and Welfare v. Meza,* 368 F.2d at 392. Moreover, such a requirement would virtually nullify the presumption-of-death provision. "Both in theory and in practice, an applicant would be able to satisfy such [a] burden only by

**13.** The Secretary's remaining argument is not persuasive. He contends that because Grossman's departure was *explained,* it cannot support a presumption of death. Def.'s Mem. at 17–18. The fact that the wage earner himself explained his plans to disappear does not prevent the presumption from arising. *See, e.g., Gardner v. Wilcox,* 370 F.2d 492 (9th Cir.1966) (presumption arose in case of wage earner who expressed suicidal intent in a letter received

shortly after he disappeared). Although the wage earner's explanation for his disappearance ordinarily might defeat the presumption, that result should not necessarily obtain when the explanation involves a prediction of death, such as by suicide or illness.

**14.** This fact is undisputed.

presenting direct evidence of death." *Johnson v. Califano*, 607 F.2d at 1182. The standard articulated in *Secretary of Health, Educ. and Welfare v. Meza*, 386 F.2d at 392, furthermore, is supported by a "consideration of the position of the parties ... and the equities involved." *Sinatra v. Heckler*, 566 F.Supp. 1354, 1359 (E.D.N.Y. 1983). In many cases, the claimant will lack the resources to pursue and disprove every rational alternative explanation for the wage earner's disappearance. There is at best only an attenuated connection between a claimant's ability to discredit alternative explanations for the wage earner's disappearance and the likelihood that the wage earner is dead. The potential for the denial of meritorious claims is thus needlessly excessive under the Secretary's proposed standard.

In holding that no presumption of death had arisen, the Secretary imposed an improper burden on the plaintiffs. The application of an erroneous legal standard in itself justifies a reversal of the Secretary's decision. *Rutherford v. Schweiker*, 685 F.2d 60, 63 (2d Cir.1982) (Timbers, J., dissenting), *cert. denied*, 459 U.S. 1212, 103 S.Ct. 1207, 75 L.Ed.2d 447 (1983); *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979) (Secretary's determination could not stand if evidence had been improperly evaluated because of an error of law); *Northcutt v. Califano*, 581 F.2d 164, 167 (8th Cir.1978) (ALJ's decision should have been reversed because of error of law); *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir.1968) (although findings were supported by substantial evidence, decision must be reversed if proper legal standards were not used in weighing evidence or rendering decision).

▪ Once the presumption of death arose, the burden of going forward shifted to the Secretary to rebut the presumption by affirmative evidence that the wage earner is alive or "by proof of facts that rationally explain the anomaly of the disappearance in a manner consistent with continued life." *Secretary of Health, Educ. and Welfare v. Meza*, 368 F.2d at 392; *accord Mando v. Secretary of Health and Human Services*, 737 F.2d at 281; *Shel-*

*nutt v. Heckler*, 723 F.2d 1131, 1133 (3d Cir.1983); *Edwards v. Califano*, 619 F.2d at 869; *Johnson v. Califano*, 607 F.2d at 1182; *Aubrey v. Richardson*, 462 F.2d at 785. To be credited, the Secretary's rebuttal evidence must be more than speculative; it must constitute substantial evidence that directly points to a rational explanation other than death for the wage earner's disappearance. *E.g., Shelnutt v. Heckler*, 723 F.2d at 1133 (rebuttal effort failed because Secretary introduced no affirmative evidence of wage earner's alleged financial and marital troubles, alcoholism, or illegal acts); *Autrey v. Harris*, 639 F.2d at 1235 (rebuttal burden "requires more than mere conjecture as to possible explanations"); *Aubrey v. Richardson*, 462 F.2d at 785 (rebuttal entails " 'proof of facts' which do—not merely may—'rationally explain' " the disappearance); *Secretary of Health, Educ. and Welfare v. Meza*, 368 F.2d at 392 (Secretary must present "proof of facts that rationally explain the anomaly of the disappearance in a manner consistent with continued life").

Measured against this standard, the Secretary's evidence fails. The Secretary maintains that Grossman was "not dying but wanted [his family] to *believe* that he was dying." Def.'s Mem. at 14. He points to Grossman's alleged "considerable financial difficulties," his deep distress over his second wife's death, and his concerns about a change in management at the Sea Gull. *Id.* at 15. Moreover, the Secretary contends that Grossman had a history of drinking and that his ties to his family were on the wane. "The record unequivocally shows that Grossman's absence from his former residence in Brooklyn is explained by the fact that he deliberately left, assumed a new identity and traveled at least as far as Colorado." *Id.* at 11. The Secretary concludes that Grossman's "departure was carefully executed and, therefore, *not* unexplained." *Id.* at 12.

These hypotheses are not supported by substantial evidence. The record shows that Grossman's life was characterized by an unusual degree of stability: He resided in Brooklyn most of his life; he was married to the plaintiff for sixteen years; he

worked at the Sea Gull Restaurant for nearly eighteen years; he was a union member for nearly twenty-five years. Audrey Grossman testified that he was reliable and attentive in meeting his family obligations, even after their divorce. His visits with Connie appear to have slackened off primarily during Gloria's illness. Moreover, Grossman had no history of desertions, marital strife, or family discord; no arrest record; and no illicit connections. The record contains one reference to him as a "heavy drinker." A.R. at 178. This reference, however, is isolated. More important, the Secretary has presented no evidence that Grossman had a drinking problem severe enough to impel flight. Similarly, although the Secretary suggests that Grossman faced impending financial disaster, the Secretary has relied almost entirely upon financial conditions that were long-standing in Grossman's life. The Secretary's suggestion that Grossman fled to avoid reminders of his deceased second wife is pure conjecture. The ALJ incomprehensibly confused Audrey's reaction with the wage earner's when he wrote: "This sort of grief reaction [the desire to flee] occurred when Audrey Grossman and the wage earner lost a child in an accident and *she* refused to return to surroundings which reminded her of the child." *Id.* at 12 (emphasis added). Obviously, Audrey's reaction must be distinguished from Grossman's. Even if he, too, felt compelled to flee Brooklyn after his child's death, *see id.* at 74, the record is clear that he did not remain absent for long. Therefore, the Secretary has failed to muster substantial evidence in support of his proffered explanations for Grossman's disappearance.

▪▪▪ Even if there were substantial evidence that Grossman had reason to flee, his absence for over ten years would remain unexplained. It is apparent, both as a matter of law and as a matter of common sense, that facts that explain an initial disappearance do not necessarily explain a prolonged absence. *See Penrose v. Heckler,* 566 F.Supp. 301, 304 (D.Nev.1983) (although departure was explained, continued absence was not); *Bukawyn v. Schweiker,* 567 F.Supp. 533, 535 (E.D.N.Y.1982); *Smith v. Celebrezze,* 243 F.Supp. 955, 956 (S.D.Iowa 1965); *Wells v. Celebrezze,* 244 F.Supp. 601, 604 (E.D.N.C.1965). The Secretary was required, therefore, to produce substantial evidence that explained *both* Grossman's disappearance and his ten-year absence in a manner consistent with continued life. This he has failed to do.[15] Consequently, the presumption of death remains unrebutted.

In finding the Secretary's evidence deficient, the court is mindful of its limited scope of review. Congress has declared that the Secretary's factual findings are conclusive if supported by substantial evidence. *Rivera v. Harris,* 623 F.2d 212, 216 (2d Cir.1980) (reviewing court may not consider the question of entitlement *de novo* but must assess whether the Secretary's findings are supported by substantial evidence). Substantial evidence is less than a preponderance of the evidence, *see Rutherford v. Schweiker,* 685 F.2d at 62 ("factual issues need not have been resolved by the Secretary in accordance with what we conceive to be the preponderance of the evidence"); *Schauer v. Schweiker,* 675 F.2d 55, 57 (2d Cir.1982), and "more than a mere scintilla." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.; see Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Fiorello v. Heckler,* 725 F.2d 174, 176 (2d Cir.1983).

A reviewing court would be "derelict in [its] duties if [it] simply paid lip service to

---

**15.** The court agrees with the wise pronouncement in *Johnson v. Califano,* 607 F.2d at 1183: "[I]n every person's life there are difficulties which could, in the event of a disappearance, inferentially provide plausible explanations for an absence." This statement is true of Grossman, who experienced hardship, even tragedy, in the years immediately before he disappeared. Such "difficulties ..., taken alone, cannot adequately rebut a presumption of death." *Id.* The Secretary must provide a "more direct connection between the predeparture difficulties and the proposed explanation of flight." *Id.*

this rule, while shaping [its] holding to conform to [its] own interpretation of the evidence." *Rutherford v. Schweiker,* 685 F.2d at 62. The court would be equally derelict, however, if it failed to set aside a decision that it could not "conscientiously find" was supported by substantial evidence "when viewed in the light that the record in its entirety furnished, including the body of evidence opposed to the [Secretary's] view." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Such is the case here.

*Conclusion*

For the reasons stated above, the Secretary's decision is reversed and this case is remanded for further proceedings in accordance with this opinion.[16] On remand, the Secretary is instructed to find that the plaintiffs have raised an unrebutted presumption of death. After a determination of the wage earner's date of death, the plaintiffs are to be awarded survivors' benefits in an amount set by the Secretary. The plaintiffs' motion for sanctions pursuant to Rule 11, F.R.Civ.P., is denied.[17]

IT IS SO ORDERED.

---

**16.** Given the absence of a "showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record," 42 U.S.C. § 405(g), no new evidence may be heard upon remand.

**17.** The plaintiffs argue that the Secretary's position is so indefensible that sanctions pursuant to Rule 11, F.R.Civ.P., should be imposed. They contend that, although the Secretary "may have been able to make a good faith argument in opposition to plaintiffs' motion, there was absolutely no basis for the Secretary's moving for judgment on the pleadings." Plaintiffs' Reply Mem., June 18, 1987, at 14.

The Secretary's apparent policy of "nonacquiescence" has been soundly criticized, but it does not warrant Rule 11 sanctions in this instance. Sanctions "shall be imposed against an attorney and/or his client when it appears that a pleading has been interposed for any improper purpose, *or where,* after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law." *Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 254 (2d Cir. 1985).

The Secretary is not liable under this standard. The ALJ ruled that the facts did not support an award of benefits, and while that finding is not supported by substantial evidence, it is not groundless. Moreover, the Second Circuit has yet to resolve the precise issue raised by this appeal. *Mando v. Secretary of Health and Human Services,* 737 F.2d 278 (2d Cir.1984). Thus, it was not "patently clear that [the Secretary's claim had] absolutely no chance of success under the existing precedents, and [that] no reasonable argument [could] be advanced to extend, modify or reverse the law as it stands." *Eastway Constr. Corp. v. City of New York,* 762 F.2d at 254. This is particularly true because "any and all doubts must be resolved in favor of the signer." *Id.* Under these circumstances, the motion for sanctions is denied.